## W. A. Johnson et al. v. Mrs. O. C. McMahan.

No. 5250.   Decided April 10, 1929; January 22, 1930.
(15 S. W., 2d Series, 1023.)

*Hamilton & McMath,* for appellants.

It was error for the court to make permanent an injunction restraining the defendant, Johnson, from cutting a ditch wholly upon his own land to drain Dry Lake into Hackberry Draw, which was shown by the uncontradicted evidence to be a natural water course with a pronounced channel, and well defined banks, and the natural drainage channel for the entire watershed in which defendant Johnson's land is situated, and because the water comes into said lake from Hackberry Draw, for the reason that every land owner has the legal right to drain his land of surplus water, in the interest of good husbandry, into any adjacent natural drainage way which Nature has provided, especially where such act will not result in overflowing such natural drainage channel upon the lands of subservient owners, and because the evidence in this case shows with-

out contradiction that the drainage of said lake would not overtax the capacity of Hackberry Draw, nor cause water to flow out of its channel on to the plaintiff's land. Jefferson County Drainage District v. McFadden, 291 S. W., 327 (citing a long list of cases including Aldritt v. Fleischauer, 70 L. R. A. 301; Todd v. York County, 72 Neb., 207, 66 L. R. A., 561; Mason v. Fulton County, 24 L. R. A., 903 N. S.); Rattan v. Wood, 267 S. W., 312; Wilkerson v. Garrett, 229 S. W., 666; Lambert v. Alcorn, 20 L. R. A., 611; Mason v. Fulton County Commissioners, 24 L. R. A. (N. S.) 903; Fleasner v. Steinbrauck, 34 L. R. A. (N. S.) 1059; Gillfillan v. Schmidt, 31 L. R. A., 547; Baldwin v. Township, 67 L. R. A., 642; Bolivar County v. Board of Commissioners of Washington County, 28 A. L. R. 1250; San Gabriel Valley Country Club v. Los Angeles County, 9 A. L. R., 1200; Mizzell v. McGowan, 85 Am. St. Rep., 705; Sheenan v. Flynn, 26 L. R. A., 632; Trigg v. Timmerman, L. R. A., 1916F, 424; Pholman v. Chicago, M. & St. P. Ry. Co., 6 L. R. A. (N. S.), 146.

The statutes which have been enacted in Texas, in recent years, on the subject of water control, and relied on by appellee, do not, as we believe, change the rule or encroach upon the right of drainage discussed and decided in the cases above decided. Articles 7590 and 7591, prohibit the taking of water from a natural stream, water course or watershed, and diverting it into another and different watershed, and clearly have no application to the drainage of water accumulated in lakes, ponds or lagoons, and the drainage thereof into the natural drainage channel of the same watershed. A careful reading of these articles, also of Article 7589a as amended by the 40th Legislature, will produce the conviction that the language of those statutes precludes the construction of those articles or any of them as prohibiting or inhibiting the drainage of land into natural waterways crossing or abutting upon the same. Ainsworth v. Texas & N. O. R. Co., 288 S. W., 481.

Under the common law rule the landowner certainly had such right: Barnett v. Matagorda Rice & Irrigation Co., 83 S. W., 801; Old River Co. v. Barber, 210 S. W., 763.

By reason of the above principles and authorities discussed under this proposition, defendants urgently insist that the injunction granted by the court against them, discriminates against them, and deprives them of an inherent right which they have by reason of the ownership of their property, that such is a valuable right, and the property constituting the Dry Lake area will be rendered prac-

tically worthless by such injunction, and upon every principle of equity said injunction and the judgment of the court should be set aside. Spann v. City of Dallas, 235 S. W., 512.

*Charles E. Coombes* and *W. D. Wilson,* for appellees.

Plaintiff's pleading and the evidence adduced showed with sufficient certainty threatened injury and damage to plaintiff's land to warrant the judgment perpetuating the injunction. Revised Statutes, Arts. 7590, 7591; Acts 40th Legislature, Ch. 56, p. 80; Miller v. Letserich, 292 S. W., 560; Higgins v. Spear, 283 S. W., 584; Wilkerson v. Garrett, 229 S. W., 666; Shuttles v. Butcher, 1 S. W., 2nd, 661; Foster v. Kelley, 3 S. W., 2nd 894; Vol. 40, Cyc., pages 445 to 448.

The drainage of Dry Lake at the point and in the manner proposed and threatened by defendants will not drain said lake through the natural drainage, but will divert same from the natural drainage over the Smith land to Hackberry Draw where it leaves the Smith land, and will thus burden plaintiff's land with that which is naturally absorbed upon the Smith land. Same authorities.

Nor have the principles announced in Spann v. City of Dallas, 235 S. W., 513, cited and relied on by appellants been upheld, but have been overturned by the Supreme Court of the United States in Village of Euclid v. Ambler, 272 U. S., 365, 47 S. Ct., 114, and cases following and reported in 47 S. Ct., pages 594 and 675. As supporting our contention, we desire to especially call attention to the law as laid down in 40 Cyc., pp. 445 to 448.

### ON MOTION FOR REHEARING.

To determine whether the draining of Dry Lake into Hackberry Draw would be a diversion of the water from one watershed to another, it is necessary to consider what is a watershed. In a broad sense it may be, and doubtless is, true that the whole territory drained by the Mississippi river is the watershed of that river; but that is not the sense in which the term watershed was used in the statutes in question. In the sense there used, the term means the smaller areas from which the water drains by natural channels into each of the rivers, creeks, lakes, etc. of the country; and a natural basin or lake into which the water naturally flows from eight or ten square miles of territory is a watershed within the meaning of the term as used in the statutes referred to. Otherwise the term would be meaningless, for it would be a practical impossibility to

divert the water from one of the major streams of the state into another such stream. But the diversion intended to be prohibited was from the smaller watersheds of each of the small streams, draws or lakes to another. This is made clear, we think, by reference to the general provisions of the water statutes of the State, articles 7466, 7467, et seq., declaring the control, storing and distribution of its storm and flood waters, the reclamation and drainage of its over-flowed lands and other needing drainage are each and all public rights and duties; and that the waters of all lakes, and the storm, flood or rain waters of every river or natural stream, canyon, ravine, *depression or watershed* within the State of Texas, are declared to be the property of the State, and the right to the use thereof may be acquired as thereinafter provided, and may be diverted from its natural channel for the purposes expressed, by complying with the provisions of the laws applicable thereto. It seems clear to us, from the whole public policy of the State as declared in the statutes referred to, that it was the purpose of the Legislature to declare all such waters subject to the statutes mentioned, and to prohibit the diversion thereof without a compliance with the laws in relation thereto. The language of the statutes referred to would seem to indicate that the Legislature considered each river or natural stream, canyon, ravine, depression or lake as having a watershed of its own, and did not intend to comprehend in the term watershed all the territory draining into one of the major streams of the State. If this be the true meaning and intent of the Legislature, then each of the smaller areas from which water flows by natural channels into a river or natural stream, canyon, ravine, *or depression,* is a watershed, and to divert the water therefrom to another stream, canyon, ravine or depression would be to divert it from one water-shed to another in violation of the articles mentioned, unless done in accordance with the provisions of the law relating thereto. We may further say that the certificate, as well as the facts of the case show, that Hackberry Draw is not a stream or watercourse, except in the sense that surface water flows therein during or immediately after rainfall, that it runs across the cultivated lands of appellee and others, and to drain the lake therein would materially increase the water flowing through said draw onto and over appellee's cultivated lands, and cause it to flow for longer periods of time, increase the acreage overflowed, wash away the soil and damage and destroy her crops. It would cause water to flow over appellee's land that would not otherwise do so, to the injury and damage of her lands and

crops; and it was just such a diversion of water from one watershed to another that it was intended to and is prohibited by the statutes under consideration, in our opinion.

MR. PRESIDING JUDGE SHORT delivered the opinion of the Commission of Appeals, Section B.

The following statement and questions based thereon from the Court of Civil Appeals for the Seventh District have been filed with the Supreme Court and referred to this Section of the Commission for disposition:

This appeal is prosecuted from a judgment in the District Court of Dickens County, perpetuating, after a hearing on the merits, a temporary injunction theretofore granted, restraining W. A. Johnson and W. P. T. Smith, the Appellants, from draining a lake located on Johnson's land into what is known as Hackberry Draw, which crosses the farm on the land of Appellee, Mrs. O. C. McMahon.

The record shows that W. A. Johnson owns the S. W. ¼ of Survey No. 297 and a strip of land extending along the west side of Survey No. 284 from its northwest corner to Hackberry Draw. That W. P. T. Smith owns all of the west ½ of Survey No. 284 except the strip thereof owned by Johnson; that the Appellee owns the S. 105 acres of the S. E. ¼ of Survey No. 284 and the N. 60 acres of the N. W. ¼ of the Survey No. 259, which two tracts constitute one body of land. Survey No. 259 is immediately south of Survey No. 284, and No. 284 is immediately south of Survey No. 297. That Dry Lake covers approximately 160 acres of land, 120 acres of which is in the N. W. ¼ of Survey No. 297; that the land is 2.7 feet deep in the center, is a natural basin into which the water falling on eight or ten square miles of territory lying north, northeast and northwest of the lake drains; that water stands in the lake from one-third to one-half of the time and on several occasions it has remained full for many consecutive months; that when the lake overflows from excessive rains, the overflow passes out near the southeast corner and meanders through a natural depression on the east part of the northwest quarter of Survey No. 284 and reaches Hackberry Draw and through it flows onto and over the land of Appellee. Hackberry Draw is some eleven miles in length, runs in a southeasterly direction, crosses Survey No. 296, which is immediately west of Survey No. 297, runs over the S. W. ¼ of Survey No. 284 and enters Appellee's land on the west, spreads out over

her farm and finally flows into Dockum Creek. Dockum Creek roughly parallels the course of Hackberry Draw to near the point of their confluence. Hackberry Draw is a drain or depression through which water flows, but is dry except while it is raining and immediately thereafter. Its width across Appellee's land varies from 100 feet to 60 feet and it is about 2½ feet deep in the center with a natural slope to either side. It runs down in a few hours after a rain and many of the farmers through whose land it passes cultivate the land in the draw, plow across it and grow farm products therein, as the soil is sub-irrigated and very productive. During excessive rains Dockum Creek occasionally overflows into Hackberry Draw and said overflows into Dry Lake and on the north and east of said lake there are other natural ponds or basins that overflow into Dry Lake; but, independent of such overflow water, Dry Lake is a natural basin into which the rainfall on some eight or ten square miles of territory, drains. The soil in Dry Lake is sub-irrigated, fertile and would be susceptible of cultivation and very productive, if drained.

W. A. Johnson was digging, and if he had not been enjoined, would have completed a ditch from the southwest part of Dry Lake on his S. W. ¼ of Survey No. 297 to and along his strip of land on the west side of Survey No. 284 to where it would empty into Hackberry Draw. The length of the ditch if completed, would be 4,434 feet and its average depth 8 or 9 feet with a width of 6 feet at the bottom and 10 feet at the top. The natural drainage for the lake when it overflows is about one-half mile east of the proposed ditch. The proposed ditch would drain the water from Dry Lake and empty it into Hackberry Draw and thence onto some of the cultivated lands of the Appellee. It would materially increase the amount of water that flows over Appellee's land under natural conditions, cause water to flow over her land that would not do so without the ditch, would cause the water to flow longer and stand longer on her land than it would without the ditch and increase the acreage overflowed under natural conditions; all of which would result in injury to Appellee's cultivated lands, wash away the soil, damage her crop and destroy her alfalfa field.

W. A. Johnson had never sought Appellee's permission to drain the lake into Hackberry Draw, but he pleaded and testified that he intended to put a flood gate in the ditch for the purpose of holding the water in the lake until the water from natural rainfall and other sources passed out of Hackberry Draw.

We attach hereto a map used before this Court in the oral argument by counsel for both Appellants and Appellee.

Appellants insist that they are not prohibited by Articles 7589, 7589a and 7590, R. C. S., from draining Dry Lake by the proposed ditch into Hackberry Draw and are not liable for damages that will be sustained by Appellee on account of the increased flow to which Appellee's land will be subjected, so long as Appellants are guilty of no negligence.

In as much as the decision of the case requires a construction of said articles of the statutes and a determination of the legal liability of Appellants for the damage that will be inflicted on Appellee, we deem it advisable to certify to your Honorable Court for decision, the following questions:

"1. Is the Appellant, W. A. Johnson, prohibited by said statutes, or either of them, from draining said lake, by means of the ditch, into Hackberry Draw, which is a natural drain?

2. Is W. A. Johnson liable for the damages that will result to Appellee by the increased acreage overflowed by the water drained from the lake by the proposed ditch?"

We think both questions propounded should be answered in the negative. The map attached to the certificates shows Dockum Creek and Hackberry Draw to be well defined water courses running parallel with each other, in a general way, having their origin at the foot of the plains and forming a junction to the south of the lands mentioned in the certificate. Dry Lake, so called, is in the watershed of and to the east of Hackberry Draw. Dockum Creek lies west of Hackberry Draw. The depression in the lands of the Appellant, Johnson, designated as Dry Lake, covers from 120 to 150 acres of his quarter section, the deepest part of which depression is 2 feet and 7 inches. The surface and flood water flowing across this land would naturally empty into the water course, designated upon the map as Hackberry Draw, shown to be a well-defined channel having its origin at the foot of the plains and running to its junction with Dockum Creek for a distance of about 11 miles. It is shown that Dockum Creek contains a stream of flowing water the year around, but that Hackberry Draw only has water in it when a sufficient amount of rainfall has occurred to concentrate from its water-shed an amount of water sufficient to create a flow. In times of flood the natural banks of Hackberry Draw overflow occasionally, but unless the flood waters are unusually large, its natural banks are sufficient to confine the waters between them.

"The owner of land has the right to collect the surface water and the natural drainage of his land into ditches, drains, or artificial streams and discharge it into a natural water course on his own land, which is a natural outlet of the water so collected, and is not liable to lower proprietors, although by this arrangement the flow of the water is increased, provided the discharge is not beyond the natural capacity of the water course, and the same rule is applied in some cases where the conduit thus made is not a water course in the sense of a running stream, but is a ravine or gully or natural depression in the soil, having a fixed and determinate course which forms a natural and usual channel for the escape of surface water." 40 Cyc. 648–9.

In the case of Dallas Land & Loan Company v. Garrett, 276 S. W., 471, the Court says:

"Property consists not only in ownership and possession, but in the unchallengeable right of its use, enjoyment and disposition. If therefore anything destroys or seriously interferes with the free exercise of this right, to that extent the property itself is destroyed. If the right of the owner to use his property is denied or seriously interfered with, it is necessarily rendered profitless. It follows that any order issued by a court forbidding the owners of property to do with it as he chooses so long as he does not choose to create a nuisance, destroys the chief element of value in property. (Citing Spann v. City of Dallas, 235 S. W., 513, by our Supreme Court). These self evident propositions should admonish a court of equity that before such radical procedure is entered upon the facts upon which the court is called to act should be of no doubtful or uncertain nature and should not be based on imagination, conjecture or guesses." Citing Lancaster v. Harwood, 245 S. W., 755.

"The extraordinary writ of injunction is not available to protect one from threatened injury which is purely conjectural." Browning v. Hinnerman, 224 S. W., 236.

"But in any event when the injunction will cause great injury to the defendant and will confer no benefit or very little benefit in comparison upon the complainant it is within the discretion of the court to refuse the application. Likewise where the complainant can at slight cost protect himself, he is not entitled to the equitable relief. In all cases the court takes into consideration the relative inconvenience to be caused to the parties and will refuse an injunction if it appears inequitable to issue it." (Citing 22 Cyc. 782), Simon v. Nance, 142 S. W., 661, 22 Cyc., 782–783.

Article 7590 provides that no person shall take water from any "natural stream, water course or watershed in this State into any other watershed," without a permit from the Board of Water Engineers to divert such water. Article 7591 merely prescribes a penalty for violating Article 7590. Before the provisions of Article 7590 could be violated the facts must show that the water from the natural stream, or water course or a watershed, have been diverted into another watershed. We do not understand the certificate to state the existence of any such facts. The contrary rather appears that the proposed ditch would not take water out of any natural stream, or water course, nor divert water from one watershed into another. Rather it appears that the Appellant, Johnson, was proposing to assist the natural flow of surface waters into Hackberry Draw by constructing the ditch mentioned in the certificate. Should this purpose be accomplished Hackberry Draw would receive waters from its own watershed. In other words, the depression designated as Dry Lake is a part of the watershed of Hackberry Draw. The natural flow of the water, which would be conducted into Hackberry Draw by means of the construction of the proposed ditch is across the watershed of Hackberry Draw into this water-way. There could be no diversion of these surface waters by means of the construction of the proposed ditch. The ditch proposed to be constructed is to prevent the cessation of the natural flow of surface water north of the land owned by the Appellant, Johnson, known as Dry Lake, across his land and into the natural drainage channel for the watershed of Hackberry Draw. Article 7589a provides that it shall be unlawful to divert the natural flow of surface water, or to impound such surface water so as to damage the property of another by the overflow of the diverted or impounded waters. The construction of the proposed ditch by the Appellant, Johnson, could not have the effect to divert the natural flow of surface water, nor to impound such surface water so as to damage the property of another by the overflow of the diverted or impounded waters. The territory designated as Dry Lake is in no sense a waterway, having its own independent watershed, from whence it receives its supply of water. It is like any other slight depression in the surface of the earth wherein water seeking its level finds its way temporarily. The owner of such depression has a right to dispose of it by furnishing a conduit into its natural drainage channel. As said in Jefferson County Drainage District v. McFadden, 291 S. W., 327, wherein some of the authorities on the subject are cited:

"We think that by the great weight of authority the rule is well settled that surface water may be collected by drains and ditches so long as it is not diverted from its natural flow, and carried into channels and streams made by nature for its passage, even though its accumulation and flow may be thereby hastened and the lands of lower landowners along the stream into which the water is discharged subjected to increased overflow, without giving a cause of action to nearby or adjoining landowners. In such cases the injury is *damnum absque injuria.*"

The judgment of the Court of Civil Appeals in the case was affirmed by the Supreme Court, though not on this point. 4 S. W. (2d) 33.

In Todd v. York County the Supreme Court of Nebraska says:

"An owner has the undoubted right to protect his land from surface water, and in the interest of good husbandry to drain lagoons or basins thereon, of a temporary character, by discharging such surface waters by means of artificial channels into a natural surface water drain, or channels on and over the land of another, provided such person acts in a reasonable and careful manner without negligence; and the injury, if any, resulting therefrom to any lower proprietor, by reason of the increased flowage in the natural surface water drain, will be accounted *damnum absque injuria.*" 72 Neb., 207, 66 L. R. A., 561.

The question in the case from which the last citation is taken is exactly the same question that is involved in this case. In that case it is further said:

"The ravine or draw * * * in a technical sense is not a water course; it is however unmistakably a natural waterway or channel in which surface water flows to its mouth and affords an outlet for all the water draining from the surrounding country into Beaver Creek, a natural water course,"—just as Hackberry Draw is a natural waterway or channel in which surface water flows to its mouth and is an outlet for all the water drained from the surrounding country into Dockum Creek, a natural water course. The court says in the same case further:

"The territory immediately surrounding the basin, except as modified by the basin itself, drains into the draw, passing .over the plaintiff's land. The draw is the natural outlet for the surface water falling in that territory and is the natural outlet for the basin and the land drained into it, if it is to have an outlet at all. Treating the basin and the land drained into it as an independent water-

shed, then counsel's position is right, but viewing the land as we think it should be done, as having a natural drainage into some permanent lake, or other similar body of water, or into a regular water course, by means of surface water channels, the territory in question properly and naturally drains into the draw spoken of, thence into Beaver Creek, a natural water course."

The facts in the case of Aldritt v. Fleischaure, 70 L. R. A. 301, decided by the Supreme Court of Nebraska, are somewhat similar to the facts in this case. In that case the owner was permitted to drain a pond having no natural outlet over its brink and into a very shallow depression, through the field of the plaintiff, who sought an injunction, who had been cultivating the land for several years, crossing this depression with his cultivation, just as the defendant in error in this case is shown to have been doing, actually cultivating the bed of the depression. Courts will take judicial knowledge of the general character of the country in passing upon questions of this kind and the Supreme Court of Nebraska, in which state much of the territory is similar to that shown by the facts of this certificate, where much of the land is rolling plains country with occasional basins and ponds and where much of the drainage was by small draws that the owners of land, through which such draws ran, are charged with knowledge of their drainage value and of rights of owners to drain such ponds and basins through such drains, where it is said:

"They, (meaning the drains,) afford almost the only means of surface drainage available to the husbandman, and his right to the use of same, reasonably exercised, should not be lightly impaired."

The case of Ainsworth v. Texas & N. O. Ry. Co., 288 S. W., 481, declares, in effect, that the draining of water which is accumulated on land, in the general direction which the water would naturally flow, is not a diversion of the natural flow of surface waters. Where water so accumulates on land without the aid of the owner this is not an impounding of water by him. The common law rule, therefore, we think, has not been changed by any of these statutes, in so far as it applies to the right of a landowner to drain his land into natural drainways where the tendency of such water is naturally to drain towards such drainways, provided, of course, he does this in a reasonable way and uses land in constructing said drain which belongs to him or which he has the right to use for that purpose. This common law rule and the

right of the landowner to be protected thereby is announced by our Supreme Court in Barnett v. Matagorda Rice Irrigation Co., 83 S. W., 801, and also by the Court of Civil Appeals in Old River Company v. Barber, 210 S. W., 763. (Writ of error refused). It is scarcely conceivable, under the facts stated in the certificate, and shown by the map attached, that the laws of this State could be construed in such a way as to prohibit the Appellant, Johnson, from constructing a conduit such as he proposes to construct for surface waters flowing across his land into their natural drainage channel for the purpose of relieving his land, valuable for tillage purposes, of water, which otherwise would gather thereon temporarily, until it disappears by evaporation or percolation, and thereby render useless and valueless a large quantity of his acreage, which otherwise would be used for the benefit of the state and its citizens and especially of the owner. It is our opinion the Legislature did not intend to restrict the right of owners of land under the conditions outlined in the Certificate, to protect it from damage in the way the plaintiff proposes, which he has under the rule of the common law relating to this subject.

We therefore recommend that both questions be answered in the negative.

The opinion of the Commission of Appeals answering the certified questions is adopted and ordered certified.

C. M. Cureton, Chief Justice.