## WILSON v. HAGINS.

### No. 1286—5758.

Commission of Appeals of Texas, Section B.

June 1, 1932.

W. D. Wilson, of Spur, and Cooper & Lumpkin, of Amarillo, for plaintiff in error.

B. G. Worswick, of Dickens, G. E. Hamilton, of Matador, James P. Stinson, of Abilene, and Coombes & Andrews, of Stamford, for defendant in error.

RYAN, J.

This is the second appeal in this case. 116 Tex. 538, 295 S. W. 922; (Tex. Civ. App.) 262 S. W. 770.

This suit was filed by A. J. Hagins and B. J. Hagins against W. T. Wilson to recover damages alleged to have resulted to the plaintiffs' lands from the erection of an embankment by defendant which caused the flood waters of Duck creek to be diverted from defendant's land and to flow across the lands of plaintiffs, and to enjoin such diversion.

Duck creek is not a perennial stream and is dry and does not flow except in times of rains and freshets.

It is alleged by the plaintiffs, Hagins, supported by their evidence, that the northeast corner of section 153, the northwest corner of section 154, the southwest corner of section 167, and southeast corner of section 168, are common corners; that A. J. Hagins is the owner of and in possession of the north ½ and the southwest ¼ of section 154, and B. J.

**798**

Hagins, of the southwest ¼ of section 167, and the defendant Wilson, of the east ½ of section 153 and the south ½ of the southeast ¼ of section 168, and one Carlisle, of the northeast ¼ and of the north ½ of the southeast ¼ of said section 168, all situated on Duck creek, the general course of which is from northwest to southeast; also, that Wilson owns a farm on the west side of the natural channel of Duck creek and the Hagins' farms are situated east of said creek, which has a considerable watershed, and during rainy seasons and after freshets, the overflow at times covers the entire creek bottom, which is about seven hundred yards from hill to hill at the places where the farms of the parties are situated; that during overflows caused by heavy rains, much of the flood water left the creek bed on the west side of the natural channel and ran southerly across Wilson's land, and in order to protect his land from such overflows he dug a ditch from the foot of the high ground or hill on the west side of the creek diagonally in a southeasterly direction to the natural channel of the creek opposite the Hagins' farms, and built an embankment along the south side of and the length of such artificial ditch, as a result of which, flood and overflow waters which had theretofore flowed southerly over Wilson's land were diverted onto and flooded Hagins' farms.

During overflows caused by unusual rains, a great deal of the flood water left the creek bed on the west side of the natural channel and ran southerly across and flooded Wilson's land; the effect of the ditch and dam erected by him was to prevent the overflow and protect Wilson's land therefrom and to divert this flood water onto the Hagins' farms. Wilson's land on the west side of the creek was several inches lower than the surface of Hagins' land.

There is evidence to the effect that at one time Duck creek channel entered the north half of the southeast quarter of section 168 owned by Walter Carlisle (which is immediately north of W. T. Wilson's land) and continued approximately from a point designated on the plat in evidence, as the "Plum Thicket" on Carlisle's land; thence meandering north, northeast, and easterly to a confluence with another dry creek marked on said map "Button Willow Creek"; thence making a large bend southeasterly and southwesterly on B. J. Hagins' land (the southeast quarter of section 167) to near the common corner of sections 153, 154, 167, and 168; thence in a southeasterly and southern direction over the western portion of section 154 owned by A. J. Hagins. This portion of the channel between the "Plum Thicket" and "Button Willow Creek" filled up and ceased to exist; but as said by the Court of Civil Appeals, 25 S. W.(2d) 916, 918: "It does not appear that Duck creek was threatening to change its

course and to cut a new channel across Wilson's lands. No such issue was submitted to the jury, and if the evidence raises such an issue, it has been abandoned by the appellant's failure to have it submitted. Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084."

The map in evidence shows the lines of two channels in two old draws, running south from the vicinity of the dividing line between Wilson on the north and Carlisle on the south, on section 168, over section 153, made by overflows, the flood waters of which were carried south over section 153 and discharged on lands south of the south line of section 153. These flood waters were diverted from that flow by the erection of Wilson's ditch and dam, into the creek on A. J. Hagins' land, and (as claimed by him) caused the overflows on his land, which would not have occurred but for such diversion.

The cause of action is based upon the alleged wrongful diversion of flood waters. The evidence shows that flood waters flowed across Wilson's land prior to the construction of the embankment, which, as a result of and after such construction, were diverted onto Hagins' land to the east.

After the plaintiffs had dismissed as to J. W. Carlisle and the court had disposed of B. J. Hagins by instructing the jury to find against him, the case was submitted to a jury upon three special issues, viz.:

(1) "Did the defendant divert the natural flow of the waters of Duck Creek in such a manner as to damage the land of plaintiff, A. J. Hagins, by the overflow of said water so diverted, if any?" The jury answered: "Yes."

(2) "If you answer issue No. One in the affirmative, then state in what sum, in dollars and cents, the land of plaintiff A. J. Hagins was so damaged." Answer: "$250.00."

(3) "If you find that the defendant did divert the natural flow of the waters of Duck Creek in such manner as to damage the land of plaintiff, A. J. Hagins, then state whether or not damage will occur in the future to the land of A. J. Hagins from waters so diverted." Answer: "We do."

Based upon the verdict, the court rendered judgment for A. J. Hagins for the amount assessed by the jury, and perpetually enjoins Wilson from maintaining the ditch and embankment, provided that he is not required to fill up and close the ditch cut by him, but after the removal of certain obstructions, the ditch shall be and remain as it now is, except that he is enjoined from erecting any embankments, levees, or dykes along or upon the same and from making said ditch deeper or wider.

This judgment was affirmed by the Court of Civil Appeals. 25 S.W.(2d) 916.

■ Whether the waters causing the damages in issue are to be treated as surface wa-

ters or as the waters of a stream or drainage way, if the natural flow thereof was diverted in such a manner as to cause damage to another's land by the overflow of said water so diverted, the result is the same and the party causing such diversion and damage is liable therefor.

In Miller v. Letzerich et al. (Tex. Sup.) 49 S.W.(2d) 404, 408 (not yet reported in State Report), Chief Justice Cureton announces the rule, under the civil law, as to surface waters, to be as to coterminous estates, as follows: "Rainwater which falls on lands is, so long as it remains on the land, the property of the owner, to do with as he pleases, in the absence of some prescriptive or contractual right. * * * Lands lower than the coterminous estate owe a service to receive the burden of surface waters which may flow from the higher estate onto the lower, so long as the surface water from the dominant estate reaches the borders of the servient one untouched and undirected by the hands of man," subject to the right of the owner of the dominant estate to "use his land in the ordinary way for farming purposes, cultivating it, irrigating it, and making any reasonable use of it in good faith for the production of crops, even though such use might result in some change in the natural flow and quantity of the surface water which the servient estate was due to receive." He then says: "We have just stated the rule of the civil law as to surface waters. The rule of the English common law as to surface waters is said by leading authorities to be the same as that of the civil law. 27 Ruling Case Law, p. 1140, § 72; Farnham on Waters, vol. 3, §§ 889, 889b. See, also, 8 California Law Review, p. 197; 33 Harvard Law Review, pp. 133, 183; Boyd v. Conklin, 54 Mich. 583, 20 N. W. 595, 596, 52 Am. Rep. 831; Coulson & Forbes Law of Waters (4th Ed.) pp. 135, 140, 153; Gibbons v. Lenfestey, 84 L. J. P. C. 158. * * * Mr. Farnham, in his work cited above, after reviewing at length the English cases, concludes: 'The common and civil law, therefore, appear to be the same so far as the right to have the water follow its natural course is concerned.' * * * The authorities cited appear to be conclusive of the question that the English common-law rule as to surface waters is substantially the same as that of the civil law."

The original petition herein was filed on January 22, 1923, at which time chapter 7, Gen. Laws, 1st Called Sess., 34th Leg. (1915), was in effect. This act, approved May 29, 1915, declares unlawful the diverting of the natural flow of surface waters, or the impounding thereof, in such manner as to damage the property of another; it seems not to have been carried into the Rev. Civ. Stat. of 1925, but was re-enacted by act approved February 19, 1927 (chapter 56, Gen. Laws, 40th Leg. [1927]), and is now article 7589a,

Vernon's Annotated Civil Statutes. Discussing this, the court, in Miller v. Letzerich, supra, said: "We are of the opinion that the act of 1915, article 7589a, Vernon's Ann. St., is valid and effective to prevent the diversion of surface waters * * * in such a manner as to cause destruction or damage."

In Higgins v. Spear, 118 Tex. 310, 15 S.W. (2d) 1010, the facts, very similar to those here, were:

"The parties own adjoining tracts of land. There is a lowland tract known as a slough, commonly accepted to be an old river bed, extending through the plaintiffs' land into the defendants' land. In a southerly and westerly direction from the land of the parties is another tract of lowland known as a slough. In the neighborhood of the lands of the parties is what is known as Arroyo de Macho or Burro Creek; also what is known as Madden Draw. Burro Creek and Madden Draw are dry runs, but when the rains fall the surface water concentrates and flows therein. Prior to the construction of certain ditches, embankments, and irrigation canals hereinafter mentioned, the flood waters of Burro Creek and Madden Draw flowed naturally into the lowland or slough to the south and west of the lands of the parties, and thence into the Rio Grande River at a point west of the parties' lands except when the lowland was 'entirely overflowed,' in which event the overflow water would back up on plaintiffs' land and pass thence through the old river bed onto the defendants' lands.

"Prior to July, 1924, third parties, for whose acts neither the plaintiffs nor defendants are responsible, constructed upon their own lands certain ditches, embankments and irrigation canals which diverted the natural flow of the waters of Burro Creek and Madden Draw from the aforesaid lowland to the south and west of the lands of plaintiffs and defendants, whence most of it would have passed into the Rio Grande River without touching the lands of the parties to this suit. In consequence of this diversion the water passed into the old river bed or slough on plaintiffs' land and thence onto the defendants' land. Prior to July, 1924, the defendants constructed upon their land for the protection thereof from such flood waters, an embankment across said old river bed. In consequence of this embankment water flowing in the river bed in July, 1924, and in September, 1925, was impounded and backed up on the plaintiffs' land, damaging growing crops upon about 33 acres of plaintiffs' land, to their damage in the sum of $1,400 in July, 1924, and $785 in September, 1925. The rains causing the flow of this flood water were heavy, but not unprecedented, and might reasonably have been anticipated.

"The trial court concluded:

"(1) Defendants were liable in damages for

any act of theirs which interfered with the natural flow of the surface water.

"(2) Defendants were not liable for any act of theirs reasonably necessary to protect their land from the overflow of surface water diverted to their land by the aforesaid embankments, canals and ditches.

"(3) Defendants, in view of the artificial diversion of surface water to their land, were justified in erecting embankments to prevent the overflow of their lands by the waters artificially diverted.

"(4) Defendants are not liable to plaintiffs for the damages sustained by the overflows in 1924 and 1925, and (plaintiffs) are not entitled to the relief sought."

In that case, Associate Justice Higgins of the El Paso Court of Civil Appeals held (283 S. W. 584, 585) that, since the act of 1915, "it makes no difference, so far as concerns the rights of the parties, whether the water, the flow of which was obstructed by defendants, be considered surface water or water flowing in a well-defined channel or water course."

The Supreme Court, through Associate Justice Pierson, affirmed the judgment of the Court of Civil Appeals and expressly approved "the clear and able opinion of Associate Justice Higgins in this case," and especially that portion thereof which announced the doctrine that "land is subject to no servitude to receive upon it water, the natural flow of which has been diverted to it."

Again, in Bunch v. Thomas (Tex. Sup.) 49 S.W.(2d) 421 (not yet reported in State Report), Chief Justice Cureton quoted from and approved that holding of Judge Higgins.

Here, the natural flow was south over Wilson's land; Wilson diverted such flow towards the southeast and onto A. J. Hagins' land by building the embankment on the upper part of his own land.

In I. G. N. R. R. Co. v. Reagan (Tex. Sup.) 49 S.W.(2d) 414 (not yet reported in State Report), the conclusion was reached that the company was liable, either under the civil law or the common law, for the obstruction of a natural drainway or stream, such as the creek there in question.

In Gembler v. Echterhoff (Tex. Civ. App.) 57 S. W. 313 (writ of error denied), the court said that it is immaterial whether the water, after being collected in artificial channels and reservoirs and then discharged or cast in undue and unnatural quantities upon the land of another, be strictly surface water, spring water, or drainage water, liability attaches by reason of such diversion.

We are cited to Johnson v. McMahan, 118 Tex. 633, 15 S.W.(2d) 1023, 1025, by plaintiff in error, but the holding in that case is not in conflict with what is said above. There, it was shown that Dockum creek and Hackberry draw are well-defined water courses running parallel with each other in a general way, and form a junction to the south of the lands involved, Dockum creek lying west of Hackberry draw. "Dry Lake," so called, is a depression in the watershed of and to the east of Hackberry draw, and the surface and flood waters flowing across it would naturally empty into Hackberry draw. It was shown further that Dockum creek contains a stream of flowing water the year around, but Hackberry draw only has water in it when a sufficient amount of rainfall has occurred to concentrate from its watershed an amount of water sufficient to create a flow, and unless the flood waters are unusually large its natural banks are sufficient to confine the waters between them. Judge Short held that: "The owner of land has the right to collect the surface water and the natural drainage of his land into ditches, drains, or artificial streams and discharge it into a natural water course on his own land, which is a natural outlet of the water so collected, and is not liable to lower proprietors, although by this arrangement the flow of the water is increased, *provided the discharge is not beyond the natural capacity of the water course*, and the same rule is applied in some cases where the conduit thus made is not a water course in the sense of a running stream, but is a ravine or gully or natural depression in the soil, having a fixed and determinate course which forms a natural and usual channel for the escape of surface water."

In the case at bar the plaintiff alleged in his pleadings that in times of heavy rains and high water the channel of Duck creek was not sufficient to carry all the water; that the natural course of the stream covered a large portion of the lands owned by Carlisle and by Wilson, and by the plaintiffs (Hagins), and Wilson by building the embankment and cutting the ditch, changed the natural flow of the water onto and in such a manner as to damage plaintiff's land, thus coming within the proviso stated by Judge Short. The findings of the court in the Johnson v. McMahan Case show that the banks of the channel of Hackberry draw were sufficient to hold the water diverted by the defendant in that case and the normal overflow and flood waters, while here, the portion of the channel of Duck creek into which the ditch emptied was not sufficient to hold the waters of that creek in ordinary rains and the natural course of the water in flood and high-water times was between the hills mentioned in the opinion of the Court of Civil Appeals.

Under our view of plaintiff's second amended original petition, a recovery was sought for injuries complained of, in violation of statute as well as under the common law. The petition alleges the washing away of Wilson's embankment and his rebuilding the same, more substantially, at different times after 1922, and on two different occasions in 1926.

By pleading designated by him as his "first supplemental petition," the substance of which sufficiently states a cause of action when construed with the amended original petition, he presents in effect the same case as did the amended original pleading, in so far as a recovery as at common law is concerned. The case was tried on both said pleadings.

■ It is contended that a general demurrer should have been sustained to said denominated "first supplemental petition" on the ground that the matters therein alleged should have been set forth in an amended petition and not by supplemental petition, the object of the latter being only to reply to new facts not before alleged by plaintiff, in reply to those which have been alleged by defendant. As correctly held by the Court of Civil Appeals, the pleading denominated supplemental petition was in fact a trial amendment; plaintiff in error simply filed a general demurrer and general denial thereto, and by failing to address a special exception thereto on the ground that the matters therein alleged could not be properly pleaded by the method adopted, he cannot now complain of the form of the pleadings. Stephens v. 'Anson Motor Co. (Tex. Civ. App.) 21 S.W.(2d) 699; Kanner v. Startz (Tex. Civ. App.) 203 S. W. 603. As said by Judge Stayton of this Section of the Commission in Glenn v. Dallas Co. Dist., 114 Tex. 325, 268 S. W. 452, 453, "though a pleading may be denominated a supplement, it may actually constitute an amendment or set up a counter-claim or a cross-action, and, if not excepted to but allowed to stay in the case until judgment, may be considered for all that it means instead of what it is called."

In S. A., U. & G. R. R. Co. v. Johnson & Weathersbee (Tex. Civ. App.) 1 S.W.(2d) 350, it was said that a supplemental petition containing allegations sufficient to constitute an amended petition may be considered as such, and it was held that while in that case the supplemental petition did not contain all the essentials of an amended petition, it was so treated by the court as it was treated by the trial court and the parties to the suit.

■ The pleadings were sufficient, and the trial court did not err in overruling the demurrer thereto.

■ It was established by the evidence, and the plaintiff in error himself having alleged facts so showing, that the purpose of the ditch and embankment was to divert the flow of flood waters which would have run south over his land, the only question for the jury to decide was, (1) whether the manner or effect of the diversion was to cause damage to Hagins' land, and, if so, (2) to find the amount of such damage; the damage, if any, would result from the manner of the diversion, and issue No. 1 properly submitted the question—whether the manner of such diversion caused damage.

■ Issue No. 3 was called for by the opinion of the Supreme Court on a former appeal of this case (116 Tex. 544, 295 S. W. 922, 924), wherein the court said: "Inasmuch as this was in part a suit for an injunction, on another trial if the jury should find that the embankment and ditch did divert flood waters onto the lands of defendants in error to their injury, they should be directed to find also whether or not like damage would occur in the future from waters so diverted."

■ Complaint is made that the trial court erred in refusing plaintiff in error's requested special charge No. 2, in connection with special issue No. 1, that said special issue must be answered in the negative unless it appears from the evidence that Wilson, the defendant below, placed more water in the channel of Duck creek at the south and east of his land at the end of the ditch than was received and discharged upon his land from the channel of the stream above his land.

It is also complained that the trial court erred in refusing to submit a special issue requested by defendant, for a finding as to whether Wilson, the defendant, had caused more water to be placed in the channel of Duck creek at the point where he had constructed the ditch and embankment into the creek's channel, at its exit point, than flowed onto his land at the point of its origin on his land.

A sufficient answer to these complaints is as stated by the Court of Civil Appeals, that no complaint was made by defendant in error because Wilson caused more water to flow in the channel of the stream, but the damages resulted, as alleged, because of the diversion of flood waters when the channel of the stream would be overflowed.

We have reached the conclusion that the Court of Civil Appeals correctly disposed of the case, and therefore recommend that its judgment and that of the district court be affirmed.

CURETON, C. J.

Judgments of the district court and Court of Civil Appeals are both affirmed, as recommended by the Commission of Appeals.