**TAYLOR et al. v. TARRANT COUNTY WATER CONTROL & IMPROVEMENT DIST. NO. I.**

**No. 13181.**

Court of Civil Appeals of Texas. Fort Worth.

Sept. 6, 1935.

Rehearing Denied Oct. 11, 1935.

C. T. Gettys, of Decatur, for appellants.

Samuels, Foster, Brown & McGee and Ireland Hampton, all of Fort Worth, and Burch & Woodruff, of Decatur, for appellee.

DUNKLIN, Chief Justice.

G. I. Taylor and E. W. Jameson instituted this suit against the Tarrant County Water Control & Improvement District No. 1 to recover the value of two crops of corn and other feedstuff, one grown in the year 1932 and the other in the year 1933, alleged to have been destroyed by an overflow of water from the channel of the West fork of the Trinity river during those years, and also for the alleged injury to the grass and turf grown on about 300 acres of land which plaintiffs alleged resulted from the same cause. Those lands were owned by the plaintiffs, and they have appealed from a judgment rendered sustaining a general demurrer and several special exceptions to

their petition and dismissing the suit after they had declined to amend.

As appears in allegations in plaintiffs' petition and as judicially known to this court, the defendant was created and is ·in operation under the provisions of section 59a of article 16 of the Constitution of this state for the purpose of controlling, storing, preserving, and distributing the waters of the West fork of the Trinity river and its tributaries. See opinion of the Supreme Court in the case of Chicago, R. I. & G. Ry. Co. v. Tarrant County Water Control & Improvement District No. 1, 123 Tex. 432, 73 S. W. (2d) 55. To carry out those purposes the defendant constructed a dam across the Trinity river near the town of Bridgeport in Wise county which serves to impound the water in a lake or reservoir known as the Bridgeport Lake. The water improvement district embraces parts of Wise and Tarrant counties traversed by the river and includes the city of Fort Worth, which is supplied with water from the lake, and the expenses of construction and maintenance of its entire water system are supplied from the taxes assessed against the lands lying within the district in accordance with statutory provisions relating thereto.

According to allegations in plaintiffs' petition, during the years 1932 and 1933 the defendant relased water in large quantities from its Bridgeport Lake and reservoir through floodgates in the dam which overflowed the channel of the river below the dam and inundated some of plaintiffs' lands situated several miles below the dam and destroyed growing crops of corn and maize on 20 acres during each of those years and killed the grass and turf on approximately 300 acres used for grazing purposes.

Damages were sought for those losses on allegations that they were caused by the negligence of defendant in releasing the water from the reservoir through floodgates supplied for that purpose when there was no necessity for so doing, and, further, that defendant was guilty of negligence in impounding the water in the reservoir without first acquiring the right to use more land for that purpose, thereby necessitating the release of water from the reservoir at the times complained of in order to avoid flooding other lands above the dam which defendant had not acquired the right to so use. It was further alleged that defendant had negligently cut trees and limbs from the basin of the reservoir and had negligently permitted same to float through the floodgates of the dam at the times complained of

and to so clog and choke the channel of the stream below the dam as to cause plaintiffs' lands to be overflowed with the resultant damages for which a recovery was sought.

In connection with those allegations of negligence, it was alleged that below the dam and above plaintiffs' property there were several tributary streams which emptied flood waters into the river, thus rendering it more dangerous to plaintiffs' property to release water from the reservoir at the times in controversy.

■ Article 1, § 17, of our State Constitution provides that: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." While plaintiffs expressly invoked that constitutional provision ·as the primary basis of their suit, it is apparent that they sought to hold the defendant liable for the alleged negligence under the rules of the common law. Indeed, if by the alleged flooding their lands were taken, damaged, or destroyed for or applied to public use, then defendant would be liable under the express Constitution, independently of whether the same constituted negligence. Jefferson County Drainage District No. 6 v. Langham (Tex. Com. App.) 76 S. W.(2d) 484.

■ It is apparent from plaintiffs' petition that the alleged flooding of their land, situated several miles below the lake and dam, was temporary only, and not a necessary incident to the operation of defendant's water system, and, therefore, did not come within the prohibitive provisions of the Constitution quoted. Chicago, R. I. & G. Ry. Co. v. Tarrant County Water Control & Improvement District No. 1, 123 Tex. 432, 73 S.W.(2d) 55; 10 R. C. L., par. 58, p. 67, par. 69, p. 79; Lamb v. Reclamation District No. 108, 73 Cal. 125, 14 P. 625, 2 Am. St. Rep. 775.

It cannot be doubted that the creation and operation of a water improvement district is a work of great public importance and, to some extent at least, involves a governmental function. However, in Hidalgo County Water Improvement District No. 2 v. Holderbaum, 11 S. W.(2d) 506, 507, this was said by the Commission of Appeals:

" 'Damaging or destruction' on account of 'public' use, required to be compensated (section 17, art. 1, Constitution), includes injury resultant (a) of construction of works and (b) of subsequent maintenance and operation. [Citing case.] 'Property'

thus 'damaged or destroyed' may be vicinal only [citing cases], and consist of tangibles or of any of the 'several rights of ownership recognized by law with respect to' tangibles [citing cases].

"The 'damaging or destruction' (as the 'taking') required (in section 17, art. 1) to be compensated, presupposes its infliction by the state or by state authority. The 'district,' whatever its degree as a public or governmental agency (section 59, art. 16, Constitution), has no immunity from liability for injuries referred to in section 17, art. 1."

To a like effect are the decisions in Hidalgo County Water Control & Improvement District No. 1 v. Peter (Tex. Com. App.) 37 S. W.(2d) 133, and other decisions there cited.

In Hidalgo County Water Improvement District No. 2 v. Holderbaum, the damages held to be recoverable were from waterlogging plaintiff's land that adjoined the improvement district canal through seepage from its construction and use as a permanent structure and the injury resulting therefrom was continuous. In Hidalgo County Water Control & Improvement District No. 1 v. Peter, the damages held to be recoverable were from backing the water from defendant's reservoir on to plaintiff's land, where it was permanently impounded, without first acquiring the right so to do by statutory proceedings. In Fort Worth Improvement District No. 1 v. City of Fort Worth, 106 Tex. 148, 158 S. W. 164, 48 L. R. A. (N. S.) 994, the facts on which the Supreme Court concluded that the improvement district was liable appear from the following statement in the syllabus of that opinion:

"The owner of one bank of a stream has no right to erect embankments to protect his land from overflow which will change the natural flow of the waters in time of flood and cast it upon his neighbor's land."

The injured party in that case was the owner of the opposite bank of the stream.

In Jefferson County Drainage District No. 6 v. Langham, 76 S. W.(2d) 484, by the Commission of Appeals, it was held that the drainage district would be liable to Langham for constructing a part of its drainage system through which water from rainfalls over a large section of the county were diverted from their natural courses and drained into Taylor's bayou, which was of insufficient capacity within its banks to carry off both its own and the waters from the drainage ditches, and thereby the bayou was caused to overflow its south bank and inundate plaintiff's land contiguous thereto.

City of Waco v. Craven (Tex. Civ. App.) 54 S.W.(2d) 883, and City of Waco v. Rook (Tex. Civ. App.) 55 S. W.(2d) 649, were suits for damages for flooding lands owned by plaintiffs, situated below a dam constructed by the city on the Bosque river, on allegations of an insecure foundation of the dam on a gravel base, rendering it liable to break, and also because the channel of the stream below the dam had been so changed as to force the flow of the stream directly over plaintiffs' lands, which would not have occurred without such change.

The facts in the foregoing cases clearly distinguish them from the present suit, and the same may be said of many other decisions cited by appellant, a detailed discussion of which would unduly prolong this opinion.

■ The decision of the Supreme Court of California in San Gabriel Valley Country Club v. Los Angeles County, 182 Cal. 392, 188 P. 554, 557, 9 A. L. R. 1200, was in a suit by San Gabriel Country Club against the county of Los Angeles for damages to plaintiff's land as the result of its inundation from certain storm drains that had been constructed by the defendant. Prior to the construction of those drains water from two canyons had spread over the surrounding country and had not overflowed plaintiff's land, which was situated a mile or more below the lower end of the drain. The effect of the drain was to increase the volume of water after it had passed the lower end of the drain, and plaintiff's land was overflowed by reason of that increase. We quote the following from that opinion:

"The plaintiff's position is based on the much-quoted maxim, 'Aqua currit et debere currere ut currere solebat.' But there are many departures from this rule, of which the right to a reasonable use of the water in the stream by an upper riparian owner is perhaps the most familiar. The exercise of this right in most cases diminishes the flow. But there are uses which at times increase it, as, for example, where dams are put in for the use of mills and the water is allowed to escape at times in greater volume than the stream would then otherwise carry. In such a case no right of action by a landowner be-

low exists because of the increase of volume and consequent acceleration of flow, provided the use is a reasonable one and exercised in a reasonable manner. The reason for permitting such departure from the maxim quoted is that not to do so would be largely to destroy the usefulness of the stream. 2 Farnham on Waters, §§ 475, 476."

The court then quotes with approval the following from Mizell v. McGowan, 129 N. C. 93, 39 S. E. 729, 85 Am. St. Rep. 705:

. "Suppose the natural capacity of the watercourse was made the test of the rule; it would be so extremely difficult of application as practically to destroy its value. What is the natural capacity of a stream? Is it measured at low water or at high water? Almost any stream can · carry off whatever water may be made: to flow into it in dry weather, or perhaps even in ordinary times. On the contrary, the clearing up of our lands is having the double effect of greatly accelerating the flow of water and at the same time filling up our streams with sand, so that very few of them can now carry the water naturally flowing into them after heavy rains.

"Again, suppose the upper tenant were compelled to regard the natural capacity of the stream; how far down would this limitation extend? Naturally many others would drain into the same stream, so that the landowner near its mouth would get the accumulated waters of all those above him. In case of injury how would he apportion his damages, and where would the liability of each tort-feasor begin and end? These questions, it seems to us, would severely tax the utmost ingenuity of the courts, and leave the jury in such a state of perplexity as to seriously endanger their intelligent determination of the issues."

We quote further from the opinion as follows:

"Summing up the discussion, our conclusion, as we have stated, is that an improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden, and further that the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel. The injury to the plaintiff's land comes directly within this rule, and is therefore not actionable."

We believe the reasoning in that decision is applicable here.

■ The allegation in plaintiffs' petition that the water was released from the reservoir when there was no necessity therefor, without any statement of facts to show the lack of such necessity, is but a conclusion of the pleader, and, therefore, insufficient to show liability for the damages claimed. 33 Tex. Jur. pp. 417, 418, 444, 446. And in the absence of such facts,. it must be presumed that the act of so releasing the water from the reservoir was proper and necessary in the operation of defendant's system.

The defendant had the lawful right·to determine the amount of land needed for purposes of its Bridgeport Lake, and manifestly a charge of negligence in failing to acquire more land for that purpose was not tenable. Equally untenable is the charge of negligence on the part of defendant in cutting and removing trees from the basin of the reservoir before impounding water therein, since not only did defendant have the lawful right so to do, but it was proper in order to free the water of contamination from decaying timber.

■ As alleged in plaintiffs' petition, several streams flowed into the river several miles below the reservoir and above plaintiffs' land which greatly increased the volume of water in the river proper after heavy rainfalls. It is a matter of common knowledge that such streams, when swollen, carry driftwood of the same kind as that complained of here, and if the channel of the river was clogged with such driftwood, as alleged in plaintiffs' petition, it would be impossible to determine the source of the same, whether from defendant's lake or the streams flowing into the river below the dam. Even if that from the lake could be identified and distinguished from that which came from streams below the dam, then, manifestly, it would be impossible to determine the extent to which the débris from each of those sources contributed to the . overflow of

plaintiffs' land by the alleged clogging of the channel of the river.

Courts will take judicial notice of the operation and effect of natural laws and of matters of common knowledge. Humphreys-Mexia Co. v. Arseneaux, 116 Tex. 603, 297 S. W. 225, 53 A. L. R. 1147; 17 Tex. Jur. pp. 215, 219; Johnson v. Mc-Mahan, 118 Tex. 633, 15 S.W.(2d) 1023; 33 Tex. Jur. par. 180, p. 633; Williams v. Chew (Tex. Civ. App.) 19 S.W.(2d) 68. And in 46 C. J. par. 11, p. 35, this is said:

"Facts of which the court will take judicial knowledge need not be alleged, and the courts must read the pleading as if it contained a statement of such facts, even where there is an express allegation to the contrary."

To the same effect see 15 R. C. L. p. 1056 et seq.

In Magnolia Petroleum Co. v. Dodd (Tex. Civ. App.) 52 S.W.(2d) 670, that company was held liable for negligently leaving logs, fallen trees, heavy timber and derrick material on the banks of Seals creek which were washed down stream by flood waters and jammed, broke and flooded plaintiff's oil pick-up station designed and used for capturing oil floating down the stream. That decision was by the Court of Civil Appeals, and, as appears in 81 S.W.(2d) 653, was reversed by the Supreme Court with rendition of judgment in favor of the Magnolia Company for the reason stated in the syllabus as follows:

"One holding license for operating station for catching waste oil on waters of natural water course could not recover as a 'riparian owner' for damages caused station by logs and debris left on banks of water course by upper riparian owner and carried against station by flood waters, since operator was not a 'riparian owner' and had no 'riparian right.'"

Furthermore, we believe that case is easily distinguishable from the present suit in that the lumber and other materials which the defendant left on the bank of the stream and which was washed down into the plaintiff's oil pick-up station was of a character that it could be easily identified and distinguished from logs and branches of trees usually found floating in swollen streams, with the further distinguishing fact that in the Dodd Case it does not appear that there were tributary streams flowing into Seals creek below the place where the débris in question was left and above the pick-up station.

We therefore conclude that the allegations of negligence in allowing trees and branches therefrom to escape down the river and to so clog its channel as to cause plaintiffs' land to overflow were insufficient to show a right of recovery.

Moreover, if plaintiffs should be allowed a recovery upon any or all of the allegations of negligence in this suit, then it would follow that every riparian owner below the dam for an indefinite distance and similarly situated would have the same cause of action, and thereby the purpose of the creation and operation of defendant's water control and improvement district would be will-nigh defeated unless it should by purchase procure the right to flood all the lands subject to overflow below the reservoir and dam from the uses complained of in this suit. It could have no lawful authority for condemnation of those lands for such occasional and temporary uses. Lamb v. Reclamation District No. 108, 73 Cal. 125, 14 P. 625, 2 Am. St. Rep. 775.

For the reasons stated, the judgment of the trial court is affirmed.