CHICAGO, ROCK ISLAND & GULF RAILWAY COMPANY V. TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NO. 1.

No. 6384. Decided May 30, 1934.
(73 S. W., 2d Series, 55.)

434

*Ocie Speer,* of Austin, *C. T. Gettys,* of Decatur, *Robert Har-*

*rison,* of Fort Worth, and *W. F. Peter,* of Chicago, Ill., for appellant.

The Constitution provides that no person's property shall be taken, damaged.or destroyed without compensation. The taking of a four mile section of appellant's railroad between Bridgeport and Graham will "destroy" the Bridgeport-Graham line for railroad purposes, and therefore destroy its value for that purpose, unless the gap is filled by a new link of railroad connecting the two broken pieces of the present line. The basic principle, too well settled to require citation of authority, is that where a part of a piece of property is taken for public use, just compensation includes damages to the remainder of such property. It is those damages to the remainder of the Bridgeport-Graham line that are in issue here. The appellant would be entitled to recover the value of the whole Bridgeport-Graham branch if the damage that will be thus imposed on it could not be repaired; and is entitled to recover the cost of repairing that damage, which is the amount that must be expended to build the necessary additional line to connect the broken parts of the old line, and to recover due compensation for the increased future cost of maintaining and operating the new line. Missouri, K. & T. Ry. Co. v. Rockwall County Levee Imp. Dist., 117 Texas, 34, 297 S. W., 206; Fort Worth Imp. Dist. v. Fort Worth, 158 S. W., 164; Board of Hudson River Regulating Dist. v. Fonda, J. & G. Railway Co., 249 N. Y., 445, 164 N. E., 541; United States v. Louisiana & Arkansas Ry. Co., 67 Fed. (2d), 1017; United States v. Illinois Cent. Ry. Co., 3 Fed., Supp., 1005.

*Samuels, Foster, Brown & McGee,* and *Ireland Hampton,* all of Fort Worth, for appellee.

The right of recovery on the part of appellant was and is limited to the agreed value of the property (3.9791 miles of railway) actually taken for the easement, and no more. R. S., 1925, Art. 6320; Gulf, C. & S. F. Ry. Co. v. Milam County, 90 Texas, 355, 38 S. W., 747; St. Louis, S. F. & T. Ry. Co. v. Shaw, 99 Texas, 559, 92 S. W., 30, 6 L. R. A. (N. S.), 245; Miller v. Letzerich, 121 Texas, 248, 49 S. W. (2d), 404; Michigan L. S. & So. Ry. Co. v. Clough, 242 U. S., 375, 61 L. Ed., 374; Mills v. United States, 46 Fed., 738, 12 L. R. A., 673.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This case here on certified question. The suit arose out of

a statutory effort on the part of appellee to condemn for its corporate purposes certain lands upon which the appellant had constructed, and for some twenty-five years has maintained, its roadbed, tracks, etc. The appellant, Chicago, Rock Island & Gulf Railway Company, a railroad corporation, chartered under the laws of Texas, owns and operates a line of railroad which runs through Wise, Tarrant, and other counties, in the former of which, on a branch line running from Bridgeport in Wise County to Graham in Young County, is located the locus of this controversy. The Appellee is a water control and improvement district, a governmental agency, body corporate and politic, organized under the Constitution and laws of this State, and is entitled to condemn the property in controversy. The statutes relative to the organization of the District, its purposes and operations, are elaborate ones, designed to accomplish the objects specified in the Conservation Amendment to the Constitution, compliance with which is here admitted. Vernon's Complete Texas Statutes, Title 128, Chap. 3A; Acts 39th Leg., Chap. 25; Acts 41st Leg., Chap. 280.

The constitutional provision referred to, Section 59a, Article 16, adopted by a vote of the people on August 21, 1917, in part read as follows:

"Sec. 59a. The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid, and other lands needing irrigation, the reclamation and drainage of its over-flowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and costal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

"(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law."

The appellee in its brief summarizes the objects sought to be

accomplished by it, in aid of which the improvements here involved were being constructed, as follows:

"(a) To abate the deposit of silt in Lake Worth which forms the present source of supply of water for the City of Fort Worth and to protect the Dam which stores water in Lake Worth from destruction by excessive flood.

"(b) To release water to Lake Worth in order to form an adequate source of supply of water for the City of Fort Worth.

"(c) To furnish water for the irrigation of approximately 28,000 acres of land situated in the Valley of the West Fork of the Trinity River in Wise County, Texas, lying between the Bridgeport Dam and the South Line of Wise County, in a position contiguous and approximately parallel to the mainline railroad of the defendant.

"(d) To minimize the floods which in a state of nature would overflow the valley land of the Trinity River situated between the Bridgeport Dam and the South Line of Wise County, which is an area contiguous to the main line tracks of the defendant, and which tracks in places are subject to inundation by extreme flood, which result from water to be controlled by the Bridgeport Dam. Also, by means of the combined effect of the Bridgeport flood control works and the Eagle Mountain flood control works to afford protection against flood for an industrial area of approximately 3,000 acres, situated in and near the City of Fort Worth, and in which area there are situated among other houses, plants and industries, extensive yard and terminal facilities of the defendant, all of which by means of the plaintiff's works will be protected against flood.

"(e) To furnish water for the operation of locks to provide for the navigation upon the Trinity River from the Gulf to Mexico to the City of Fort Worth, at such time as the Federal Government may decide to improve said stream for navigation. Plaintiff alleged that each and all of the objects sought to be accomplished are objects recognized by the laws of Texas to be governmental in character."

The extent and magnitude of appellee's activities are shown in the testimony of its engineer, Nichols, from which we quote as follows:

"The Tarrant County Water Control and Improvement District Number One is making improvements aggregating $6,500,-000. The principal structures are

    (1) Main Bridgeport Dam
    (2) Berkshire Levee
    (3) Eagle Mountain Main Dam

    (4)   Burgess Levee

    (5)   Improvements to present levee system in Fort Worth.

"The Bridgeport Lake is formed by the construction of the Main Bridgeport dam and Berkshire levee. The main dam is constructed across West Fork of Trinity River just below confluence of Hunt's and Jasper Creeks with West Fork of Trinity River.

"Berkshire Levee is constructed across a saddle or gap in the hills on east side of Bridgeport Lake. Its construction is made necessary by the low elevation at this point and provides a 'side dam' for retention of flood waters. This levee is as essential to the project as is the main dam.

"Approximately $2,150,000 has been spent on the Bridgeport Lake.

"The works being constructed by Tarrant County Water Control and Improvement District Number One have a two-fold purpose (1) storage for beneficial uses, and (2) storage for flood protection to lands and properties below the Bridgeport Dam.

"Water stored for beneficial uses will be used for (1) water supply for Fort Worth, Texas, and other communities along and near the Trinity River; (2) ultimate irrigation of twenty-six thousand acres of land in Wise County below Bridgeport dam."

The constructions giving rise to this controversy are on the West Fork of the Trinity River, in Wise County, and consist of a large dam across the river about four miles west from the town of Bridgeport, and a levee, known as the *Berkshire Levee,* in the same area, but approximately five miles southwest of the town,—the purpose of the structures being to impound and hold the waters of the river and its attendant tributaries in a large reservoir designated on the map as *Bridgeport Lake.* See Exhibits "A" and "B" from the record, shown here in reduced scale.

By referring to these exhibits the precise question here involved may be readily understood. Bridgeport Lake, which will be made by the constructions of appellee, is the shaded area on Exhibit "B" and will submerge 3.9791 miles of appellant's railway, of an agreed value of $128,538.00. West of the shaded area, and between the flood shore line of the lake and the station Vineyard, and east of the lake between its flood shore line and the point indicated at the intersection of appellant's railway and the *"Proposed Relocation"* are two sections of appellant's railway, which, while not to be covered by the waters of the lake, nevertheless will be "dead ends," and of no practical value,

as we view the record. The distance from Vineyard on the north, through the lake, following appellant's railway to its intersection with the line of the proposed relocation, is 9.54 miles, of an agreed value of $243,000.00. The distance from Vineyard, following the line of the *"Proposed Relocation,"* passing west of the lake, and to the point of intersection with appellant's railway, east of the lake, is 10.65 miles. The agreed cost of relocating and reconstructing appellant's line along this course would be approximately $399,000.00.

The question certified by the Court of Civil Appeals is: Which of these amounts represents the true measure of damages due appellant under the Constitution and statutes?

The Trinity River and its tributaries, in which are included the streams involved in this immediate controversy, constitute one of the great river systems of the State, with a drainage area of some 17,000 square miles. Its head-water tributaries rise east of the breaks of the plains and south of Red River in the counties of Archer, Clay, Montague, and Cooke, and form the main stream of the Trinity in Dallas County, which then runs in a southeasterly direction some 450 miles into Trinity Bay, one of the arms of the Gulf of Mexico. U. S. Geo. Survey Water Supply Paper No. 448, p. 243.

Each sovereignty which has exercised jurisdiction over the territory constituting Texas,—that is, Mexico, the State of Texas, and the United States has regarded the Trinity River as a stream navigable in fact, and from time to time enacted laws and made provision by appropriation of funds or otherwise for its improvement. Prior to the coming of the railroads it was a commercial stream upon which steamboats regularly ran, ascending on occasion as far up as Dallas. See citations below to the Acts of the Congress of "Coahuila and Texas" and the Legislature of Texas, with dates indicated. 1 Gammel's Laws, p. 319 (1833); 5 Gammel's Laws, p. 1382 (1866); 7 Gammel's Laws, p. 301 (1871), p. 1442 (1873); 10 Gammel's Laws, p. 641 (1893). In 1893 the Legislature of Texas passed a concurrent resolution requesting the Texas delegation in Congress "to secure an appropriation to open up the Trinity River for permanent navigation." The resolution in part read:

*"Whereas it is known that the Trinity River is a navigable stream, and that in 1873 as many as seventeen steamers were running on its waters, coming within thirty miles of Dallas and that as late as 1868 one landed at the foot of Main Street, in Dallas;* and

"Whereas, the people along said river, appreciating the fact

that the same is navigable, and anxious to develop the same, are now spending one hundred thousand dollars in cleaning out snags and drifts and removing overhanging timber; and

"Whereas, it has been the policy of the United States government to improve the waterways of the land and thus afford cheap transportation to the people; and

"Whereas, the improvement of the Trinity River so as to secure navigation for the entire year will save millions of dollars to the people of. Texas; Therefore,

"Be it resolved by the Senate, the House of Representatives concurring: That our senators and representatives in Congress be respectfully and earnestly requested, as speedily as possible, to secure an appropriation sufficient to open the Trinity River for permanent navigation." (Italics ours.)

In response to this resolution and further efforts to accomplish its purpose the Government of the United States has spent large sums of money improving the Trinity River for navigation purposes. Locks and dams have been installed along the stream by the United States for the purpose of making it navigable from the Gulf of Mexico to Dallas. Water Supply Paper No. 448, p. 243, U. S. Geo. Survey. It is alleged that the river is now being navigated for some 75 miles from its mouth; and, in fact, it has been designated by the State to be improved for navigation, and plans are in progress for the accomplishment of that purpose as far north as Fort Worth. Trinity River Navigation Bill, Special Laws, 42d Leg. (1931), p. 313; The Texas Alamanac and Statistical Guide (1933), p. 202.

We know historically that the Trinity River is subject to overflows from time to time, and has wrought damages to the extent of many millions of dollars in its valleys, as well as in the cities of Fort Worth and Dallas. We also know that many Levee Districts from time to time have been organized and levees have been constructed in an effort to prevent damage and to reclaim thousands of acres of land from the Trinity River floods. Texas Almanac, etc. (1933), pp. 35, 36, 37, 38.

The West Fork of the Trinity, the river involved in this immediate controversy, rises in Archer County, and passing through Jack, Wise, and Tarrant Counties flows southeasterly 145 miles to its junction with the Elm Fork of the Trinity, forming the main Trinity River about five miles northwest of the City of Dallas. Its drainage area north of the Bridgeport Reservoir is approximately 1000 square miles. Water Supply Paper No. 448, p. 243, supra. Historically, we know that this stream has wrought great damage during its flood stages at

Fort Worth and other places, and levees have been erected to prevent its ravages. Texas Almanac, supra.

■ From the length of the Bridgeport Dam as shown on Exhibit "B," approximately one-half mile, and the size of the channels of its tributaries, Jasper and Hunt's Creeks which enter the river a short distance above the dam, it is apparent that the West Fork of the Trinity River at the point where crossed by the dam is more than 30 feet wide, and therefore a statutory navigable stream. Revised Statutes, Art. 5302; Motl v. Boyd, 116 Texas, 82, 286 S. W., 458.

As shown by Exhibit "B," a number of tributaries enter the West Fork of the Trinity in the region of and west and northwest of Bridgeport Dam, viz: Big Creek, Cundiff Creek, Snake Creek, Beans Creek, Jasper Creek, Coalbed Creek, and Gentry and Thompson Creeks, the latter two uniting to form Hunt's Creek; and others, the names of which are not given on the map. It is obvious from the Exhibit, as well as from the testimony, that Bridgeport Lake is located not only within the valley walls of the West Fork of the Trinity River and its attendant tributaries named above, but also with a fan-shaped natural basin suitable for reservoir purposes. The Lake basin and its features are described by the witness Nichols as follows:

"A reference to Exhibit 'B' discloses that Jasper, Hunt's Creek and West Fork of Trinity River all lie within a large natural basin just above the Bridgeport Dam. Exhibit 'B' further discloses that no practical dam site exists in this vicinity other than that now occupied by Bridgeport Dam. I have examined the territory along the Trinity River from the headwaters of Eagle Mountain Lake to the head of the river. No other practical dam site exists that would accomplish the purposes of the lake formed by Bridgeport Dam.

"The entire east boundary of Lake Bridgeport is a continuous hill with only two breaks, one at Bridgeport Dam and the other at Berkshire Levee. The west boundary of Lake Bridgeport is a range of high lying hills. In between these two hills is the broad, flat, well defined basin formed at the confluence of Jasper, Hunt's and West Fork. *The basin is so distinctive that a reasonable examination of the territory would have disclosed its potentialities and its possible later utilization for some useful and beneficial purpose.*

"An extended study of the hydraulics of the streams discharging into the Bridgeport Lake Basin discloses, and I have further verified the fact by examination on the ground, that

flood waters from West Fork, Hunt's and Jasper Creeks have in the past been temporarily retarded and stored in the natural basin (now Bridgeport Lake) created by the valleys of these streams due to the pronounced restrictions of the valley at the point where the Bridgeport Dam has been constructed." (Italics ours.)

The map, Exhibit "B," shows that the railway of appellant in entering and passing through this basin and the higher grounds adjoining crosses Snake Creek, Beans Creek, and Hunt's Creek (formed by the junction of Gentry and Thompson Creeks) above the Berkshire levee and crosses the West Fork of the Trinity itself some 3¼ miles below the levee, 3 miles below the Bridgeport Dam, and 1½ miles west of the town of Bridgeport.

The agreed statement of facts shows that the Railroad Company has six bridges across Hunt's Creek, Jasper Creek, and other tributaries to which we have referred, ranging in length from 45 to 175 feet.

Appellant's railway after leaving Bridgeport passes in the same general direction as does the Trinity River and crosses that river at or near Boyd in Wise County and at Fort Worth. It is thus seen that the branch line of appellant, together with its main line, enters the valley of the Trinity at three different points, and in this respect is within the potential flood area of the West Fork of the Trinity, where valuable property is subject to destruction by the uncontrolled floods of the river, and therefore within the protective and beneficial limits of the very constructions involved in this litigation. As to this matter, the undisputed testimony of Nichols, the engineer, in part, shows:

"The Bridgeport Reservoir will receive water from approximately 1000 square miles of drainage area. The capacity to spillway level of the dam will be 290,000 acre feet of water, which may be applied to beneficial uses, and the reservoir has capacity to store, retard and slowly release an additional 580,000 acre feet of flood water, which is deemed to be the maximum flood which should be anticipated to proceed from the drainage area above the Bridgeport Dam. This materially will reduce the flood flows below the dam, and will much decrease the flood exposure of the roadbed and the bridges of the Rock Island from a point near Newark to Bridgeport, a distance of approximately twenty (20) miles, in which the Rock Island crosses the river and runs parallel to it. The flood control effect of this reservoir in connection with that additional flood control capacity being provided lower down the river at Eagle

Mountain, in Tarrant County, will much minimize the flood hazards now existing in the City of Fort Worth, and likewise existing nearby and parallel to the main line of the Rock Island between the cities of Fort Worth and Dallas.

"The raising and setting back of the present levee system in Fort Worth will give added protection to the properties of the Rock Island near the river in the City of Fort Worth. The present levee system is inadequate."

■ We turn now to a discussion of the terrain involved between the Berkshire Levee and the station of Vineyard, shown on Exhibit "B." The distance between these two points by straight line is approximately 6¼ miles, and represents the east and west boundaries of the area drained by Coalbed Creek, Jasper Creek, and Thompson's and Gentry's Creeks, which join to form Hunt's Creek above the crossing made by appellant's line of road. The entire area drained by these streams is some 83 square miles, and since we know judicially that the rainfall in that section of the State is approximately 30 inches, it is apparent that Hunt's Creek and Jasper Creek carry a large volume of water into the West Fork of the Trinity above the Bridgeport Dam.

Jasper Creek, according to Exhibit "B," rises in Jack County, flows northeast about 10 miles, and enters the West Fork of the Trinity above the Dam.

Gentry's Creek rises about 2 miles east of Joplin, in Jack County, and flows northeasterly 14 miles, where it joins Thompson's Creek, a stream of similar length, to form Hunt's Creek above named. With reference to the drainage area, size, and habits of Jasper and Hunt's Creeks, the witness Nichols, in part, said:

"During the past four and one-half years I have on many occasions been on and over the watershed of Jasper and Hunt's Creek. These trips have carried me across the above creeks at various points some fifteen different times. At all times I have observed living water in these streams. I have observed them at very low stage—it being possible to 'hop' or 'jump by pole.' I have seen both of the above streams at flood stage, out of banks, and overflowing the adjacent bottom valley to a depth of several feet.

"Jasper and Hunt's Creeks have well defined banks and channels. Hunt's Creek channel averages about 70 feet in width and 15 feet in depth. Jasper Creek channel averages 50 feet in width and 12 feet in depth.

"I have examined early maps, government reports, and

have talked to many residents of this territory. These creeks have been substantially in their present location to the best of my belief for many years. These creeks existed at substantially the present location at the time of the construction of the railroad.

"The present bridges (or replaced bridges) have been in their present location for approximately twenty-five years.

"Above the Bridgeport dam Jasper and Hunt's Creek have a drainage area of approximately eighty-three square miles. The total drainage area above the dam is 1000 square miles.

"It should be pointed out that Jasper and Hunt's Creek in times of flood carry large volumes of water. Profile of the proposed relocation of the C. R. I. & G. (dated September 26, 1929) discloses that high water at Boone (Gentry?) Creek (Willow on Exhibit 'B') has been *seven* feet, Willow (Thompson?) Creek (Boone Creek on Exhibit 'B') has been *twenty-one* feet, and Jasper Creek has been *six* feet over their respective valleys.

"Without any question, Jasper and Hunt's Creeks are streams and water courses."

■ It is plain from the above testimony that Hunt's and Jasper Creeks, being the principal drainage streams of an area of 83 square miles, are *"streams of water"* and *"water courses"* within the meaning of Revised Statutes, Art. 6320. Indeed, it is obvious that they are streams to which water rights attach. Hoefs v. Short, 114 Texas, 501, 273 S. W., 785; International & G. N. Ry. Co. v. Reagan, 121 Texas, 233, 49 S. W. (2d) 414; Motl v. Boyd, 116 Texas, 82, 286 S. W., 458. It is equally clear that these streams carry an enormous quantity of *"flood waters,"* the flood stage of one being at times 21 feet above the low water mark, which *"flood waters"* are the property of the State. Motl v. Boyd, 116 Texas, 82, 286 S. W., 458.

The evidence quoted above also clearly shows that the streams named are navigable in law under a statute which has existed in this State since it was an independent republic. Revised Statutes, Art. 5302. Motl v. Boyd, 116 Texas, 82, 286 S. W., 458.

By observing the map, Exhibit "B," it will be seen that appellant's railway not only "crosses" the streams heretofore referred to but enters the valley of Jasper Creek and runs *"along"* the stream from where it crosses it near the flood line of the lake for approximately two miles, until it passes over an un-named tributary of that creek; it then continues across the natural basin above described, crossing Hunt's Creek and

its immediate valleys, and passes out of the confluent valley of the streams involved at the low break in the valley walls, across which has been erected Berkshire Levee.

The Constitution, in Section 17, of the Bill of Rights, declares:

"Sec. 17. No person's property shall be taken, damaged or destroyed for, or applied to, public use without adequate compensation being made, unless by the consent of such person; and when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities shall be made; *but all privileges and franchises granted by the legislature, or created under its authority,* shall be subject to the control thereof." (Italics ours.)

Revised Statutes, Article 7880-126 (Vernon's Anno. Statutes) confers the power of eminent domain on agencies such as appellee to be exercised under the general statutes governing the subject found in Title 82 of the Revised Statutes. The rules as to damages are found in Article 3265.

■ The Constitution and statutes have been construed generally to authorize the recovery of compensation not only for property actually taken under the power of eminent domain, but consequential damages as well. 16 Texas Jur., p. 986, sec. 307.

In view of this interpretation the appellant insists that it is entitled to not only the value of the property actually taken, but to an amount in addition thereto until the total shall equal expenditures involved in relocating and rebuilding its road.

The appellee claims that it is exempt as to all liability for damages, except as to the submerged part of appellant's railway, because all injuries to the appellant, consequent upon raising its tracks above the water level of Lake Bridgeport in order to pass over it, or of relocating its line, are due to the exercise by appellee of governmental authority under the police power, and that the cost of necessary or additional constructions and of operation are not compensable damages under the Constitution and statutes. Generally this insistence involves the rules of law discussed in 16 Texas Jurisprudence, page 870, secs. 221, 222, et seq., applied in the light of the obligations of appellant under R. S., Art. 6320. This statute is a part of the general code authorizing the incorporation of railways, enacted in 1876, after the adoption of the present Constitution. It reads:

"Art. 6320. *Streams of water.* Such corporation shall have the right to construct its road *across, along, or upon any*

*stream of water, water course,* street, highway, plank road, turnpike, or *canal* when the route of said railway shall intersect or touch; but said corporation shall *restore the stream, water course,* street, highway, plank road, turnpike, or *canal thus intersected or touched, to its former state or to such state as not to unnecessarily impair its usefulness, and shall keep such crossing in repair."   (Italics ours.)

■ The principal streams here involved, viz: The Trinity River, the West Fork of the Trinity, and Jasper and Hunt's Creeks, at the time appellant's road was built, were navigable streams, under the statute; their beds were owned by the State; their riparian waters held in trust by the State for the benefit of its grantees whose lands touched their banks; and their flood waters were the property of the State, *"to be controlled and disposed of by the State for the best interest of all the people."* Motl v. Boyd, 116 Texas, 82, 111, 286 S. W., 458, 468.

■ It is obvious from a reading of the statute quoted that the right to *"cross"* or pass *"along"* or *"upon"* the streams of the State, including the West Fork of the Trinity River and Jasper and Hunt's Creeks, were franchises granted by the State, and as such were accepted by the appellant when it constructed its road.   Being franchises, the rights named were by virtue of the very provision of the Constitution here invoked, viz: Section 17 of the Bill of Rights (previously quoted) *"subject to control"* and were never an "irrevocable or uncontrollable grant" of privilege or immunity.   Const., Art. 1, sec. 17.   Moreover, since appellant is a private corporation these franchises or privileges were, for an additional reason, subject to legislative control and dependent upon legislative authority.   Const., Art. 12.

It is likewise true that the correlative duty of the appellant imposed by the statute granting the rights named was and is a continuing duty, as obligatory today as when appellant's line was constructed.   Missouri, K. & T. Ry. Co. v. Rockwall Co. L. & I. Dist. No. 3, 117 Texas, 34, 297 S. W., 206; 51 Corpus Juris, p. 725, sec. 453; authorities post.

In fact, it may be said that the initial duty of the appellant at the very time it built its structures over Hunt's and Jasper Creeks and along or across their valleys was to do so in such a way as "not to unnecessarily impair" their "usefulness" at that time or at any subsequent time when the State or its citizens might undertake to use the streams in a lawful manner; and that which appellant is now called upon to do is what it should have done in the first instance; unless, of course, it

elected to make its crossings and other constructions sufficient for the time, with the duty to later *adjust them* when the public should conclude to apply the streams, which in this instance occupied a natural storage basin, to additional uses.

■ · This conclusion arises upon a consideration of the physical aspects of Texas, coupled with the history of legislation relative thereto. The statute, we think, should be interpreted in the light of the physiographic and meterological conditions of the territory to which it was intended to apply, and of the constitutional, common law, and statutory rights and privileges of those who inhabit that territory and must live under the natural conditions which there obtain. Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; Manry v. Robison, 122 Texas, 213, 56 S. W. (2d) 438; Hoefs v. Short, 114 Texas, 501, 273 S. W., 785. Heretofore, in Motl v. Boyd, supra, we have described in general terms the physiographic features of Texas, giving the origin of its river systems, and will not here repeat a description which is available. An examination of any map of the State will disclose that Texas has ten great river systems as well as some minor ones, which with their tributaries cover the vast area of the State; and it is obvious, we think, that these streams in both their beneficial and destructive effects bear a direct relationship to the economic welfare and health of the people of the State.

Much of Texas is in the semi-arid region where the storage of water for purposes of irrigation and other uses is a necessity. Hence the subject of water rights and irrigation has been not only one of importance but one of frequent legislative consideration. From an early day the utilization of streams, including the storage of water in stream ways, has been the subject of legislation, and on occasion of constitutional amendment.

The history of the subject has been reviewed and stated in some detail in Motl v. Boyd, supra, and we refer to the opinion in that case in supplement of what we here say. In addition we append in Note 1, in the margin at the close of this opinion, citations to legislation touching the subject ranging from the Act of 1852, a general law, to the Act of 1905. The opinion cited just above will show much of the subsequent legislation.

■ We have heretofore held, after a lengthy review of grants under both the Mexican law and the laws of Texas, that rights of riparians to use water not only for domestic and household uses, but for irrigation as well, are vested rights, part of the

grants of land when the grants were made. Motl v. Boyd, 116 Texas, 82, 108, 286 S. W., 458.

█ Having the vested right to use water as stated, the riparian necessarily has the authority to adopt any lawful means of making the exercise of the right effective, which in a semi-arid country means the storage of water in the stream ways or in their valleys, so far as this may be done consistently with the rights of other riparians, and upon such reasonable terms as the Legislature may prescribe, a right which the Legislature could not defeat or unreasonably burden by irrevocable or uncontrollable grants to railway companies to cross, build upon or along streams and water courses. Farnham on Waters, Vol. 2, sec. 475; Kinney on Irrigation (2d ed.), Vol. 2, sec. 842, p. 1476; Stacy v. Delery, 57 Texas Civ. App., 242, 122 S. W., 300.

Beginning in 1889 the Legislature from time to time has passed acts providing for the "appropriation" of certain waters of its streams and as an incident of the right has provided rules and regulations for its storage. Acts 21st Leg., p. 100; Suppl. Sayles Statutes (1889-1893), Title 55; see also statutes cited in Motl v. Boyd, supra. The storage of storm and flood waters was made a public right and duty by the conservation amendment to the Constitution, previously quoted. Storage reservoirs are an appropriate means of utilizing surplus waters and one commonly in use. Kinney on Irrigation (2d ed.), Vol. 2, secs. 827, 838 to 843. The use of such reservoirs is older than recorded history, has been, and is now practiced throughout the world. 12 Ency. Brit. (14th ed.), p. 685.

█ We will next discuss the subject of floods and their control. This topic we have heretofore covered quite fully in Motl v. Boyd, supra. After discussing the subject in some detail, we summarized the facts as follows:

"It is quite unnecessary to discuss at great length the subject of flood damage in Texas. Every community east of the breaks of the plains, and many west, has its own story to tell. We think it a matter of common knowledge that every stream of any size east of the ninety-eighth meridian is a flood-making stream, the valleys of which are constantly and persistently inundated."

There have been many legislative acts from a very early date down to the present time touching the subject of flood control. The later statutes we deem unnecessary to cite. Those of an earlier time will be found in Note 2 at the end of this opinion, generally listed under legislation relative to navigation and improvement of rivers. The State has also been frequently

called upon to relieve people from the disastrous effects of river floods. Some of these Acts will also be listed in Note 2.

We have heretofore held that the right of the people of the State to be protected against stream floods was a right granted them when their lands were patented, and that no one can have a vested right in an agency which is destructive of the property and rights of others. In Motl v. Boyd, supra (p. 115), we said in part:

"So, we say, in determining the right granted riparians when the land grants were made, we must consider the correlative rights of other riparians and those of the public generally to have their property and lives protected from overflows and floods, for that, too is a right granted or accorded them when their lands were patented, or when they became citizens. It is absurd to say that a riparian owner has a vested right in the flood waters, or waters which in the ordinary and usual course may become flood waters, carrying destruction in their wake. In the nature of things, one can not, under our form of government, be accorded a vested right in a natural agency which is destructive of the property and rights of others. * * * * The protection of the public against floods by levees and storage reservoirs by the State and its agencies is of ancient origin, universal in its extent, and a practice of modern times. The principle and practice not only finds expression in our statutes, but in the various States of the United States. Not only is it recognized by our statutes, but two departments of the government, the Reclamation Department and the Board of Water Engineers, are directly concerned with it, and vast sums of public money have been appropriated for the purpose. Not only is it authorized under the police power inherent in the State as a government, but the principle finds expression first in our Constitution by the amendment of 1904, and again, in broad, comprehensive, and emphatic terms, in the conservation amendment to the Constitution adopted in 1917. *In fact, it is not debatable that it is the duty of the State to control the flood waters of the State. Since the power to control exists, and has existed from the inception of the government, it carries with it the usual* established and well recognized methods of control. (Italics ours.) One is *drainage,* by which overflow conditions are *ameliorated;* another is levees, by which areas are *protected* from floods; and the third is *storage reservoirs* or *retarding basins* for impounding flood waters, controlling the streams and *preventing floods.* Each of these remedies has been long provided for by our Constitution and Statutes. Constitution, Art. 3, Sec. 52; Art. 16, Sec. 59; Revised Statutes (1911), Vol. 2, p.

1163; Vernon's Sayles' Civil Statutes (1914), Vol. 4, Arts. 5529a et seq.; Vernon's Complete Texas Statutes (1920), Arts. 2511, 2541 to 2566; Acts 1915, p. 146; Acts 1918 (4 S. S.), p. 97; see also the various irrigation statutes to be hereafter cited. *Each of these methods is of ancient origin, scientific in principle, recognized by our statutes, and we believe by the* common law. (Italics ours.) Humphrey's Floods and Levees of the Mississippi, p. 16; Regulation of Rivers, by Van Ornum, Sec. 18, p. 56, p. 307; Secs. 78 to 82; Report of the Pittsburg Flood Commission (1911), Chaps. 1 to 5; Improvement of Rivers, by Thomas and Watt, part 1, Chap. 7; Th Encyclopedia Americana, Vol. 10, Subject, Lake Moeris of Egypt; Law of Waters, by Coulson & Forbes (14th ed.), Chap. 10; 9 Ruling Case Law, p. 619; Secs. 4, 5; p. 624, Secs. 10, 11; p. 626, Sec. 12; Farnham on Waters, Vol. 2, Sec. 170."

The relationship of flood control and stream improvement to the public health, by the prevention of stagnant waters as the breeding place of the recognized carriers of dengue, malarial and yellow fevers and other infectious diseases (viz: the Anopheles mosquitoes; *Aedes aegypti* or *Stegomyia*, and *Culex quinquefasciatus*) is too well known to need comment. Probably no single subject is of greater importance to the public health of a State than the improvement and control of its streams. See Municipal and Rural Sanitation by Ehlers and Steel (Texas authorities), p. 152, secs. 167, 168, 170, 175; Ency. Brit. (14th ed.), Vol. 15, p. 846.

We turn now to the subject of navigation. This subject has been one of frequent congressional and legislative action by each sovereignty which has exercised its power over the domain which is now the State of Texas. In Note 2 at the close of this opinion will be found 130 instances, ranging in dates from 1828 to 1905, of legislative action relative to the improvement and navigation of rivers and streams. A number of these acts directly refer to the navigation of the Trinity River, as previously shown.

We have not listed subsequent enactments and current laws, since these are available, some of which have been previously cited. We do direct attention to the fact that in 1904 a Constitutional amendment was adopted providing for the issuance of bonds for *navigation improvements, including the construction of storage reservoirs,* as well as other purposes. Under it bonds could be issued and taxes collected by districts for

"(a) The improvement of rivers, creeks, and streams to prevent overflows, and to permit of navigation thereof or irrigation thereof, or in aid of such purposes.

"(b) The construction and maintenance of pools, lakes, reservoirs, dams, canals and waterways for the purpose of irrigation, drainage or navigation, or in aid thereof." Constitution, Art. 3, Sec. 52.

The conservation amendment to the Constitution has heretofore been quoted. It too provides for the use and control of streams, including the storage waters, not only for *irrigation*, but for *drainage purposes, flood prevention,* and *navigation.*

As is well known, one of the major navigation projects of the United States, the Houston Ship Channel, a stream improvement which substantially affected the course of commerce in the mid-west portion of the United States, was finally consummated under the laws of Texas relative to the subject. That the construction of the impounding reservoirs described by the witness Nichols on the Trinity, including Bridgeport Lake, will go far toward the stabilization of the flow of the river and make its navigation by locks and dams easier of accomplishment is, we think, quite certain. See generally, Ency. Brit. (14th ed.), Vol. 4, pp. 719, 721; Vol. 19, p. 326 et seq.

We have thus far directed attention to our river systems— their vast extent, and relationship to the economic welfare and public health of the State; we have recited at some length the efforts of the people through the Legislature and by Constitutional amendment to curb these streams when in their destructive moods; and utilize them in beneficial ways; we have shown that the improvement of the streams of the State for the several purposes and uses described by us has been of constant legislative concern; we have stated that certain rights of the citizen with reference to rivers and water courses are vested rights— part of the grants when made, and that as to certain of these, like the rights of the riparians to the use of the stream flow, and the storage of water in order to make effective the right of use, and the correlative right of the riparian to be protected from floods and overflows, could not be destroyed by the Legislature by irrevocable or uncontollable grants of franchise or crossing privileges, or uncontrollable grants of rights of construction "along or upon any stream"; and we have said that the beds of the streams involved in this case and their flood waters are the property of the State, held in trust for any lawful use, including navigation, irrigation, and water supply, for the benefit of all the people of the State.

This resumé leads to the decision of the ultimate question here involved: That is, did the State by the enactment of Art. 6320 intend to surrender its authority or modify its right under the police power to improve and use its streams and protect its

citizens from floods and overflows, which seriously affect economic life and public health, and make its power with reference thereto subordinate to the right of railroad companies to "*cross*" its streams, or built "*upon*" or "*along*" them? Or did the Legislature by the enactment, while granting the privileges named, intend to preserve the full measure of its police power over the streams and water courses of the State, their use and improvement? We think the second question suggests the correct answer—that by the Act in question (R. S., Art. 6320) the purpose of the Legislature was to grant the franchises, subject at all times to legislative control and the dominant authority of the police power; and that while the State should never take any physical property of railroads without compensation, in all other respects railroad companies, at their own cost, must conform their structures to the State's acts or those of its agencies, like the appellee, when engaged in the lawful improvement and control of its streams and watercourses.

■ It is quite elementary that, although the Constitution provides for compensation for property damaged or destroyed, it does not require compensation to be paid in all cases for consequential loss occasioned by the exercise of the police power. 16 Tex. Jur., pp. 870, 871, secs. 221, 222; Houston & T. C. R. R. Co. v. Dallas, 98 Texas, 396, 84 S. W., 648; Gulf, C. & S. F. Ry. Co. v. Milam Co., 90 Texas, 355, 38 S. W., 747; Cooley's Const. Lim. (8th ed.), Vol. 2, p. 1149.

■ We do not think that the Legislature by the enactment of Article 6320, making the grant of privileges therein named, intended to abrogate this rule or place railroad corporations within an excepted class. We do not believe the Legislature could by an irrevocable or uncontrollable grant of franchise surrender its trusteeship specified above or render itself impotent to discharge the State's duties with reference thereto. It is clear beyond controversy that since the streams here involved are *navigable in law,* and their beds and flood waters the property of the State, the Legislature is without constitutional power by franchise to surrender its police control over them and unreasonably impede their improvement for navigation purposes. 27 Ruling Case Law, p. 1327, secs. 236, 239; pp. 1307 et seq., sec. 216; p. 1325, secs. 234, 235; 45 Corpus Juris, p. 421, sec. 20; Cooley's Const. Lim. (8th ed.), Vol. 2, p. 1149 et seq.; authorities post.

■ We are of the opinion that Article 6320 is to be construed to mean that the duty of the railroad company under

its provisions was not only to construct its road across, upon or along the streams in the first instance so as to restore them to their former states in such maner as not to impair their usefulness, but that this duty is a continuing one; and that if its original constructions are not such that the streams may be improved by the State and their usefulness in lawful ways made available then the original constructions were not in full compliance with the statute, and the company must, if it desires to continue the use of its crossings over or its road along any of the watercourses involved, make such change in its roadbed as may be necessary under the changed conditions brought about by lawful improvements. In other words, the statute contemplated that these streams might be widened, deepened, leveed, or used for lakebeds or be subjected to other uses consistent with the rights of the public and of the State, including the improvement of the stream ways of the State in the very manner under review in this case. It is not a question of damages or no damage to the appellant, due to the cost to it of raising its embankment and bridges or moving its railway to the "proposed relocation," shown on Exhibit "B." It is just a question of the railroad company having failed in the first instance to so construct its line in a manner to admit of the empounding of the waters as here contemplated. It would be idle to say that in this instance the agency of the State is occupying much more than the actual channels of Hunt's and Jasper Creeks, and of the West Fork of the Trinity, for the reason that the improvement of the rivers and streams has always necessitated the use of their attendant valleys either for storage, levee or canal purposes. In no other way may the streams be of value, and their usefulness remain unimpaired or damages be avoided in flood time. The fact that the statute (Art. 6320) embraces the construction of railroads "along" or "upon" streams shows plainly that such occupancy, as well as the right to *"cross,"* was to be regarded as a franchise or privilege to be exercised only in obedience to the statute declaring that the usefulness of the streams should not be impaired. Our interpretation of Article 6320 in connection with the police power, we think, is supported by the authorities. Cooley's Const. Lim. (8th ed.), Vol. 2, p. 1149; Chicago, M. & St. P. Ry. Co. v. Minneapolis, 115 Minn., 460, 133 N. W., 169; Anno. Cas. 1912D, p. 1029; same case affirmed by U. S. Supreme Court, 232 U. S., 430; Chicago, B. & Q. R. Co. v. Illinois, 200 U. S., 561; Lakeshore & M. So. Ry. Co. v. Clough, 242 U. S., 375; New Orleans, G. L. Co. v. Drainage Com., 197 U. S., 453; Cincinnati, etc. Ry. Co. v. Connersville, 218 U. S., 336; Gibson v. United

States, 166 U. S., 269; Nashville, C. & St. L. Ry. Co. v. Middle Fork Obion Drainage Dist., 149 Tenn., 490, 261 S. W., 975; Missouri, K. & T. Ry. Co. v. Rockwall Co. L. & I. Dist., 117 Texas, 34; Chicago & E. R. Co. v. Luddington, 175 Ind., 35, 91 N. E., 939; Mason C. & Ft. D. R. Co. v. Board of Supvrs. of Wright County, 144 Ia., 10, 121 N. W., 80; Chicago & N. W. R. Co. v. Drainage Dist., 142 Ia., 607, 121 N. W., 193; Chicago, B. & Q. R. Co. v. People, 212 Ill., 103, 72 N. E., 219; Chicago, B. & Q. R. Co. v. Supervisors, 182 Fed., 291, 31 L. R. A. (N. S.) 1117. As to the general principle involved, Judge Cooley declares:

"Any proper exercise of the powers of government, which does not directly encroach upon the property of an individual, or disturb him in its possession or enjoyment, will not entitle him to compensation, or give him a right of action. ('*Incidental damages to property resulting from governmental activities, or laws passed in the promotion of the public welfare, are not considered a taking of the property for which compensation must be made.*') If, for instance, the State, under its power to provide and regulate the public highways, should authorize the construction of a bridge across a navigable river, it is quite possible that all proprietary interest in land upon the river might be injuriously affected; but such injury could no more give a valid claim against the State for damages, than could any change in the general laws of the State, which, while keeping in view the general good, might injuriously affect particular interests. So if by the erection of a dam in order to improve navigation the owner of a fishery finds it diminished in value, or if by deepening the channel of a river to improve the navigation a spring is destroyed, or by a change in the grade of a city street the value of adjacent lots is diminished,—in these and similar cases the law affords no redress for the injury." (Italics ours.)

It is true that under our constitutional provision (Sec. 17 of the Bill of Rights), contrary to Judge Cooley's text, we do permit recoveries by the citizen for damages consequent upon changing street and highway grades. 16 Texas Jur., p. 900, sec. 242, p. 902, sec. 243; and cases cited in notes; Cooper v. City of Dallas, 83 Texas, 239; Hart Bros. v. Dallas Co. (Com. App.), 279 S. W., 1111; Dallas Co. v. Barr, 231 S. W., 453. The rule, however, stated by Judge Cooley, in this respect, has not been abrogated as to railroad corporations. Houston & T. C. R. Co. v. Dallas, 98 Texas, 396, 84 S. W., 648; Gulf, C. & S. F. Ry. Co. v. Milam Co., 90 Texas, 355, 38 S. W., 747.

In the case of Chicago, M. & St. P. Ry. Co. v. Minneapolis, just cited, the Supreme Court of Minnesota stated:

"The railway company constructed and placed its rails on a 16-foot embankment along a strip of land 600 feet wide, separating two navigable lakes, confining a natural watercourse between the lakes in a pipe through such embankment. The company, by such construction, did not acquire such a property right in maintaining its tracks on the embankment that it is entitled to compensation for the cost of a necessary bridge to carry its tracks over a public way thereafter duly established across its right of way. The public right to lay out such way, though asserted subsequent in time to the construction of the road, is so far the prior and superior right that the company is required to make such reasonable readjustment of its tracks as is necessary to permit of the safe and convenient use of the public way. The requirement of such readjustment is not a taking or injuring of property, but rests on the exercise of the reserved or police power of the state. The proposed way is made up of a water way and walks on each side. The water way takes the place of the existing natural water course, and becomes, like the lakes it connects, public navigable water. A bridge to carry the railway tracks over this way is a necessary incident by its use by the public, and is required by public convenience and welfare."

&#42;   &#42;   &#42;   &#42;

"Under modern conditions railway companies are pioneers in development. Railroads are constructed usually in advance of the public ways and improvements made necessary by subsequent settlements. The railroad is thus first constructed making provision for existing land and water ways, but without reference to subsequent improvements. By such construction natural conditions are changed. Solid embankments may be erected across low lands, or deep cuts made through higher lands. *But it is now clearly established in this state, as in most states, that the company so builds its road subject to the reserved right of the public to lay out highways, locate drains, establish or improve water ways across the company's right of way when the necessity therefor arises. For the property taken in making such improvements compensation must be made, but for the incidental expense in making reasonable changes in the method of carrying its tracks over such improvements, when public safety, health, convenience or welfare require such change, no compensation can be claimed by the railway. Such change is required under the reserved or police power of the state."* Anno. Cas. 1912D. (Italics ours.)

This case was affirmed by the Supreme Court of the United States. (232 U. S., 430.)

In Minnesota the reserved right of the State to require the construction there in issue by the company at its own expense *was read into the charter and franchise of the company by virtue of the police power under the common law.* The instant case is much stronger, for here we have a statute which defines the duty and makes the obligation of restoration a part of the appellant's franchise, not only as a corporation, but of its right to "cross" or build "along" or "upon" the streams involved at all. Other States operating *only under the common law as to the police power announce the same rule.* Illinois is one of these states. In the case of Chicago, B. & Q. R. Co. v. Illinois, 200 U. S., 561, 50 Law Ed., p. 597, the Supreme Court of the United States, in an opinion by Associate Justice Harlan, stated the issues as follows:

"The contention of the railway company is that, as its present bridge was lawfully constructed, under its general corporate power to build, construct, operate, and maintain a railroad in the county and township aforesaid, and as the depth and width of the channel under it were sufficient, at the time, to carry off the water of the creek as it then flowed, and now flows,—the foundation of the bridge cannot be removed, and its use of the bridge disturbed unless compensation be first made or secured to it in such amount as will be sufficient to meet the expense of removing the timbers and stones from the creek and of constructing a new bridge of such length and with such opening under it as the plan of the commissioners requires. The Company insists that to require it to meet these expenses out of its own funds will be, within the meaning of the Constitutioin, a *taking* of its property for public use without compensation, and, therefore, without due process of law, as well as a denial to it of the equal protection of the laws."

He then said:

"But the railway company, in effect, if not in words, insists that the rights which it asserts in this case are superior and paramount to any that the public has to use the water course in question for the purpose of draining the lands in its vicinity, although such water course was in existence, for the benefit of the public, long before the railway company constructed its bridge. This contention cannot, however, be sustained, except upon the theory that the acquisition by the railway company of a right of way through the lands in question, and the construction on that right of way of a bridge across Rob Roy Creek at the point in question, carried with it a surrender by

the state of its power, by appropriate agencies, to provide for such use of the natural watercourse as might subsequently become necessary or proper for the public interest. If the state could part with such power, held in trust for the public,— which is by no means admitted,—it has not done so in any statute, either by express words or by necessary implication. When the railway company laid the foundations of its bridge in Rob Roy Creek, it did so subject to the rights of the public in the use of that water course, and also subject to the possibility that new circumstances and future public necessities might, in the judgment of the state, reasonably require a material change in the methods used in crossing the creek with cars. It may be—and we take it to be true—that the opening under the bridge as originally constructed was sufficient to pass all the water then or now flowing through the creek. But the duty of the company, implied in law, was to maintain an opening under the bridge that would be adequate and effectual for such an increase in the volume of water as might result from lawful, reasonable regulations established by appropriate public authority from time to time for the drainage of lands on either side of the creek. Angell, Water Courses, 6th ed., Sec. 465b, p. 640.

\*   \*   \*   \*   \*   \*

"The great weight of authority is, that where there is a natural water way, or where a highway already exists and is crossed by a railroad company under its general license to build a railroad, and without any specific grant by the legislative authority to obstruct the highway or water way, the railroad company is bound to make and keep its crossing, at its own expense, in such condition as shall meet all the reasonable requirements of the public as the changed conditions and increased use may demand.

\*   \*   \*   \*   \*   \*

"If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution. Such is the present case.

\*   \*   \*   \*   \*   \*

"Without further discussion, we hold it to be the duty of the railway company, at its own expense, to remove from the creek the present bridge, culvert, timbers, and stones placed there by it, *and also (unless it abandons or surrenders its right to cross the creek at or in the vicinity of the present crossing) to erect at its own expense and maintain a new bridge for*

*crossing that will conform to the regulations established by the drainage commissioners, under the authority of the state; and such a requirement if enforced will not amount to a taking of private property for public use within the meaning of the Constitution, nor to a denial of the equal protection of the laws."* (Italics ours.)

The State of Indiana has a statute quite similar to our Article 6320. This statute came before the Supreme Court of the United States in the case of Lake Shore & M. So. Ry. Co. v. Clough, 242 U. S., 375. In that case the court held:

"Due process is not denied by refusing compensation for the temporary inconvenience, or the cost of railway construction, resulting from the making of a drainage improvement across the rights of way of railway companies, when the improvement is made for the public benefit in the proper exercise of the state police power, and neither wantonly nor arbitrarily, when no land of the companies is taken, but their easements merely crossed, and when the duty of accommodating their railroads to such improvements is part of the obligation assumed in accepting their franchises from the State.

"The state drainage law, sec. 3, as construed by the state court, allows compensation for damages to the roads and bridges of public corporations, viz., counties, which have not agreed to bear such damages themselves, but no compensation for like damages to private railway corporations which have made such agreements in advance, through their charter undertakings. HELD, a substantial distinction, satisfying the equal protection clause of the Fourteenth Amendment."

In discussing the questions involved, the court, in an opinion by Associate Justice Pitney, in part, said:

"But the record shows that each of the companies was organized and had its existence under the general laws of the State for the incorporation of railroad companies, that is to say, an act approved May 11, 1852, and amendments thereto. 1 Ind. Rev. Stats., 1852, p. 409; 2 Burns' Ann. Ind. Stats., 1914, secs. 5176 et seq. By sec. 13 of this act (as found in Burns, sec. 5195) it is declared: 'Every such corporation shall possess the general powers, and be subject to the liabilities and restrictions expressed in the special powers following: * * * Fifth: To construct its road upon or across any stream of water, water-course, highway, railroad or canal, so as not to interfere with the free use of the same, which the route of its road shall intersect, in such manner as to afford security for life and property; but the corporation shall restore the stream or water-course, road or highway, thus intersected, to its former

state, or in a sufficient manner not to unnecessarily impair its usefulness, or injure its franchises.'

"Concerning the duty thus imposed upon railroad companies with respect to highway crossings, it has been held by the Supreme Court of Indiana in a long line of cases that the duty is applicable not only to the original construction of a railroad across highways then in existence, but also where highways are laid out and opened across a railroad after its construction; that it is a continuing duty, requiring the railroad to keep pace with the times, with the increase of public travel, the change of methods and improvements of highways, and the public desire for the increased ease and convenience of the traveling public.

*    *    *    *    *    *

"But in the Railroad Act streams, watercourses, and canals are mentioned along with roads and highways. The terms employed are broad enough to include artificial watercourses, whether employed for traffic, for irrigation, or for drainage. And accordingly it has been held by the Supreme Court of the State that with respect to a public ditch constructed under the drainage act of 1907 railroad companies are under the same duty as with respect to highways, and that the company acquires its right of way subject to the right of the State to extend such ditches across it, without compensation to the company for the interruption and inconvenience, if any, or for increased expense or risk, or for the cost of accomodating the railroad line to the crossing. Chicago & Erie R. R. Co. v. Luddington, 175 Indiana, 35, 38-40; Wabash R. R. Co. v. Jackson, 176 Indiana, 487, 490.

"No question is made but that the settled law of the State is as we have stated it, and that the charter obligations of plaintiffs in error are such as we have defined.

*    *    *    *    *    *

"The State is not proposing to assess plaintiffs in error for benefits with respect to the drainage project, nor to tax them for its support. It is requiring them merely to bear the cost of constructing crossings for their railroad lines over the proposed new channel and outlet, 'so as not to interfere with the free use of the same,' and 'in a sufficient manner not to unnecessarily impair its usefulness.' *With respect to this duty if the State has a right to impose it in aid of the drainage project, the remoteness or proximity of the area to be drained is wholly immaterial.*

"*In view of the obligations assumed by the respective companies when they accepted their franchises at the hands of the*

*State, it is very clear that the State may exercise its police power in laying out an artificial watercourse across the rights of way without making compensation to the companies for the inconvenience and expense to which they are thereby subjected."* (Italics ours.)

■ The authorities also appear to be uniform in holding that consequential damages incident to navigation improvements must be borne by the party affected, and not by the government. Mills v. United States, 46 Fed., 738, 12 L. R. A., 673; Union Bridge Co. v. United States, 204 U. S., 364, 399; Monongahela B. Co. v. United States, 216 U. S., 177, 193; 27 R. C. L., p. 1331, Sec. 239; 45 Corpus Juris, p. 424, Secs. 23, 24, 25; p. 492, Sec. 143; 20 Corpus Juris, p. 681, Sec. 145.

We believe the statute before us (Art. 6320) was passed with a view to the preservation of the rights of the public in streams and watercourses, and the right of the State to enact laws for the conservation, preservation, and use of the waters of the State by its citizens; with reference to the right of the State to act under its legislative power to provide for the navigation of its rivers; and to protect the public in its economic life and health from the effects of uncontrolled floods which were then known to characterize its great river systems. The authorities cited above, we think, support this conclusion. Our interpretation, however, is supported by our own decisions.

■ The construction of this statute (Art. 6320) came before this Court in the case of Missouri, K. & T. Ry. Co. v. Rockwall County Levee Improvement District, 117 Texas, p. 34, 297 S. W., 206, in a case quite similar in principle to the one now before us. It is unnecessary to state the facts of that case, since it is available, except to say that it involved the actual taking of a portion of the company's embankment and roadbed by the Levee District, and consequential damages due to the necessity of raising its roadbed to conform to the levee built by the District, estimated at $275,000.00. The value of that portion of the roadbed actually taken by the Levee District was approximately $2,000.00. This Court held that the later amount, that is *compensation for the property actually taken,* was all the damages to which the Railway Company was entitled; that the consequential damages due to raising the height of the Company's embankment were not recoverable outlays under the Constitution. Since the opinion is accessible we refrain from quoting therefrom because of the length of the present writing.

In the case before us the necessity of the appellant conforming its roadway to the contemplated use of the channels and attendant valleys of Jasper and Hunt's Creeks is apparent, and the statute (Art. 6320) is, we think, just as applicable here as in the Rockwall County case. True, the dam constructed is on the West Fork of the Trinity, three and a half miles northeast and the Berskshire Levee one-half mile east of the railway crossings on Jasper and Hunt's Creeks, but the river improvements contemplated extend throughout the district, certainly from Fort Worth north to the area here involved. For that matter, it is evident that the whole immediate valley of the Trinity River from the Bridgeport Dam to the mouth of the stream will be benefited by the District projects. The lake which submerges the appellant's railway lines is only one instrumentality to be used in effecting the improvements of the District as a whole, as the levee in the Rockwall County case operated for a similar but a more limited purpose in that instance.

The authority of the appellee to make the improvements upon which it is now engaged is derived from the same source as was that exercised in the Rockwall County case, viz., the general governmental power of the State, the Constitution and statutes relative to the subject matter; and if Article 6320 did not impose a limitation or burden on the right of the levee district to construct the levee involved in that case, then it seems to us it can not be interpreted to impose such a burden or limitation on the rights of appellee in this case.

On the whole, therefore, we conclude that while the appellee is responsible in damages for so much of the appellant's line as it actually takes it is not liable for the cost of raising appellant's railway line and bridges above the submergence or flood lines of Bridgeport Lake; nor for the cost of relocating and rebuilding the railroad around the lake as illustrated on the map (Exhibit "B").

■ Exhibits "A" and "B" in the record, reproduced herein, show those portions of the appellant's right of way and road which will be actually submerged by the construction of the lake, which apparently extends from Berkshire Levee on the east to Station 503-21 on the West, a distance of 3.9791 miles. In addition, however, the railroad company, as a practical question, will be compelled to abandon those sections of its track lying between the station of Vineyard and the west shore line of Lake Bridgeport, and between the Berkshire Levee and a point some three-fourths of a mile east thereof. The number of miles of railway between the points named, including those

462

portions actually submerged, and the dead ends which the company will be compelled to abandon aggregate 9.54 miles, of the agreed value of $243,000.00. It is true that only a portion of this line will be submerged by the lake, but we think the value of the remaining portion between the points named and its actual physical use will be as effectively destroyed as if covered by the water and therefore as effectively taken under the Constitution as if it was physically destroyed by the improvements of the District. Therefore, we conclude that the effect of the construction by the appellee is to destroy appellant's property for its accustomed use and therefore *"to take"* the roadbed of appellant for a distance of 9.54 miles of an agreed value under the statement of facts of $243,000.00. This is the rule under the decisions of the Supreme Court of the United States and is a correct rule, we have no doubt, under the Constitution of Texas. Cooley's Const. Lim. (8th ed.), Vol. 2, p. 1158; 10 Texas Jur., p. 868, sec. 219; Fort Worth Imp. Dist. No. 1 v. City of Fort Worth, 106 Texas, 148; 20 Corpus Juris, p. 671, sec. 139, and notes.

Under our view of the law previously expressed the claim made by the appellant for damages due to increased cost in the operation of its road over the proposed relocation is not recoverable.

Our answer to the certified question is that the true measure of appellant's damages in this case is the value of that portion of its property which will be submerged by Bridgeport Lake and the dead ends of its property rendered useless and valueless, to which we have heretofore referred. As to this property, it is agreed that its value is, and therefore the damages are, $243,000.00.

All references below are to Gammel's Laws, volume and page, and in parentheses the year of each enactment. *Syllabi* of the laws may be found at the cited pages of Raine's Analytical Index to the Laws of Texas.

### NOTE 1.

*Irrigation:* 3-958 (1852); 5-231 (1860); 5-435 (1861); 5-452 (1861); 5-570 (1862); 5-644 (1863); 5-1248 (1866); 5-1360 (1866); 5-1491 (1866); 6-1621 (1871); 7-80 (1871); 7-316 (1871) 7-1414 (1873); 8-310 (1874); 8-449 (1875); 8-1089 (1876); 9-14 (1879); 9-1128 (1889); 10-477 (1893); 10-751 (1895); 10-757 (1895); 10-1312 (1897); 11-337 (1899); 11-373 (1899); 12-279 (1903); 12-1017 (1905); 12-1101 (1905). —Raines Analytical Index, pp. 279, 280.

## NOTE 2.

*Floods:* 10-1441 (1897); 11-966 (1901); 11-1256 (1901); 12-36 (1903); 12-95 (1903); 12-278 (1903).—Raines Analytical Index, p. 230.

*Drainage:* 10-881 (1895); 10-1149 (1897); 10-1163 (1897); 11-131 (1899); 11-278 (1899); 12-1078 (1905).—Raines Analytical Index, p. 199.

*Navigation, River Improvement, Etc.:* 1-210 (1828); 1-319 (1833); 1-402 (1835); 1-1188 (1836); 1-1371 (1837); 1-1388 (1837); 1-1418 (1837); 1-1428 (1837); 1-1453 (1837); 1-1478 (1838); 2-40 (1839); 2-113 (1839); 2-471 (1840); 2-753 (1842); 2-835 (1843); 2-837 (1843); 2-937 (1844); 2-993 (1844); 3-472 (1850); 3-504 (1850); 3-536 (1850); 3-571 (1850); 3-593 (1850); 3-627 (1850); 3-792 (1850); 3-803 (1850); 3-854 (1850); 3-1037 (1851); 3-1055 (1851); 3-1173 (1852); 3-1237 (1852); 3-1263 (1852); 3-1305 (1853); 4-131 (1854); 4-191 (1856); 4-427 (1856); 4-516 (1856); 4-590 (1856); 4-653 (1856); 4-725 (1856); 4-967 (1858); 4-975 (1858); 4-1005 (1858); 4-1095 (1858); 4-1129 (1858); 4-1287 (1858); 4-1386 (1860); 4-1477 (1860); 5-161 (1860); 5-244 (1860); 5-270 (1860); 5-313 (1860); 5-956 (1866); 5-1259 (1866); 5-1315 (1866); 5-1317 (1866); 5-1334 (1866); 5-1360 (1866); 5-1371 (1866); 5-1382 (1866); 5-1424 (1866); 5-1440 (1866); 5-1488 (1866); 5-1502 (1866); 5-1509 (1866); 5-1578 (1866); 5-1580 (1866); 5-1592 (1866); 5-1636 (1866); 6-116 (1869); 6-120 (1869); 6-131 (1869); 6-416 (1870); 6-557 (1870); 6-620 (1870); 6-683 (1870); 6-1177 (1871); 6-1658 (1871); 7-282 (1871); 7-301 (1871); 7-324 (1871); 7-601 (1873); 7-674 (1873); 7-679 (1873); 7-681 (1873); 7-1187 (1873); 7-1374 (1873); 7-1425 (1873); 7-1442 (1873); 7-1444 (1873); 7-1452 (1873); 8-171 (1874); 8-187 (1874); 8-242 (1874); 8-331 (1874); 8-335 (1874); 8-394 (1875); 8-449 (1875); 8-544 (1875); 8-682 (1875); 8-690 (1875); 8-1089 (1876); 8-1189 (1876); 8-1453 (1879); 8-1486 (1879); 8-1486 (1879); 9-27 (1879); 9-217 (1881); 9-219 (1881); 9-354 (1883); 9-607 (1884); 9-608 (1884); 9-748 (1885); 9-889 (1887); 9-1202 (1889); 10-168 (1891); 10-641 (1893); 10-643 (1893); 10-776 (1895); 10-914 (1895); 10-1073 (1897); 10-1127 (1897); 10-1287 (1897); 10-1316 (1897; 10-1320 (1897); 11-660 (1900); 12-273 (1903); 12-278 (1903); 12-967 (1905).—Raines' Analytical Index pp. 374 to 379.